# UNDER SEAL
## AMENDED COMPLAINT

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States *ex rel.* | : | **Civil Action No.** |
| | : | **08 0034 JR** |
| **ANTHONY OLIVER** | : | |
| **364 Bateman Road** | : | |
| **Barrington Hills, Il 60010** | : | |
| | : | |
| | : | |
| **BRINGING THIS ACTION ON** | : | |
| **BEHALF OF THE** | : | |
| **UNITES STATES OF AMERICA** | : | |
| | : | |
| | : | **AMENDED** |
| c/o Jeffrey A. Taylor | : | **COMPLAINT AND JURY** |
| **United States Attorney.** | : | **DEMAND** |
| **Judicial Center Building** | : | |
| **555 Fourth Street N.W.** | : | |
| **Washington D.C. 20530.** | : | |
| | : | |
| and | : | **FILED UNDER SEAL** |
| | : | **Pursuant to 31 U.S.C. §3730(b)(2)** |
| c/o Hon. Michael Mukasey, | : | **and L.CvR 5.1(j)(1) and (2)** |
| **Attorney General of the United States** | : | |
| **Department of Justice** | : | |
| **10th & Constitution Avenues N.W.** | : | |
| **Washington D.C. 20530** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | |
| **vs.** | : | |

# RECEIVED

SEP 1 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**PHILIP MORRIS**
**INCORPORATED;**
**ALTRIA GROUP, INC.;**
**R. J. REYNOLDS TOBACCO**
**COMPANY; REYNOLDS**
**AMERICAN, INC.; BROWN &**
**WILLIAMSON TOBACCO**
**CORPORATION; LORILLARD**
**TOBACCO COMPANY;**
**LOEWS CORPORATION; and**
**BRITISH AMERICAN**
**TOBACCO, PLC.**

    **Defendants**

## AMENDED COMPLAINT

This cause, and this original Complaint, is a *qui tam* proceeding brought by the Relator

Anthony Oliver for and on behalf of the United States of America, and is filed IN CAMERA and

is sealed pursuant to 31 U.S.C. § 3730(b)(2).   The Relator requests that this matter remain IN

CAMERA and remain sealed subject to an investigation of the allegations set forth herein by the

Office of the Attorney General of the United States, and by the Office of the United States

Attorney for this District.  A copy of this Complaint is now served on the Hon. Michael Mukasey,

Attorney General of the United States at the Department of Justice, on Joyce R. Branda, Director,

Commercial Litigation Branch, Civil Division. Department of Justice, Room 9002, 601 D Street,

NW, Washington, DC 20004. and on the United States Attorney for the District of Columbia,

Jeffrey A. Taylor, U.S.A., Judicial Center Building, 555 Fourth Street N.W., Washington D.C.

20530.

# PARTIES

1.  Anthony Oliver, hereinafter called the Relator, is a citizen of the United States and resides in Chicago, Illinois. He brings this civil action for and in the name of the United States Government for violations of 31 U.S.C. § 3729 *et seq* to recover penalties and damages, from the eight Defendants that later became, through mergers, acquisitions, and name changes, successors to the now three major tobacco companies that signed the 1998 tobacco settlement - Philip Morris, R.J. Reynolds, and Lorillard. The Relator is the "original source" under 31 U.S.C. § 3730(b)(1), § 3730(e)(4)(B), §3732(a), and/or 28 U.S.C. §1331. He notified the Department of Defense on the 16th of November, 2007 of the potential claim against the tobacco companies.

2.  The Defendant Philip Morris Incorporated is a signatory to the hereinafter described 1998 tobacco settlement known as the Master Settlement Agreement, or MSA, with its home office and principal place of business in Richmond, Virginia.   On January 27, 2003, Philip Morris Companies, Inc. changed its name to Altria Group, Inc.  Altria Group, Inc, previously named Philip Morris Companies, Inc. and based in New York City, New York, is the parent company of Philip Morris, International, Philip Morris U.S.A., and Philip Morris Capital Corporation, all of which are hereinafter referred to as the Defendant Philip Morris, which Defendant was and presently is in the business of selling cigarettes to various agencies of the United States Department of Defense for re-sale on military bases of the Armed Forces throughout the world.

3

3.  The Defendant R. J. Reynolds Tobacco Company has its home office and principal place of business located in Winston Salem, North Carolina. In 1998, R. J. Reynolds Tobacco Company was a signatory to the hereinafter described Master Settlement Agreement (MSA). On July 30, 2004, R.J. Reynolds merged with the United States operations of Defendant British American Tobacco, operating under the name of Defendant Brown and Williamson Tobacco, and a new parent holding company, Defendant Reynolds American, Inc. was established as part of the transaction. R. J. Reynolds was and presently is in the business of selling cigarettes to various agencies of the United States Department of Defense for re-sale on military bases of the Armed forces throughout the world.

4.  The Defendant British American Tobacco, PLC. is a British Corporation licensed to do business in the United States with its office and principal place of business in London, England, U.K. It is named as a defendant because, as noted in paragraph 3, in 1998, the Defendant R. J. Reynolds Tobacco Company was a signatory to the hereinafter described Master Settlement Agreement, and on July 30, 2004, R.J. Reynolds merged with the United States operations of British American Tobacco. Operating under the name of Brown and Williamson Tobacco, British American Tobacco was and presently is in the business of selling cigarettes to various agencies of the United States Department of Defense for re-sale on military bases of the Armed forces throughout the world.

5.  The Defendant Lorillard Tobacco Company with its home office and principal place of business in Greensboro, North Carolina, was a signatory to the hereinafter described Master Settlement Agreement. Lorillard was a wholly owned subsidiary of the Carolina Group. Carolina Group, through its subsidiary, Lorillard, Inc. produces and sells cigarettes and is based in New York, New York, with the same address of Loews Corporation, where it presently is a wholly

owned subsidiary of Loews Corporation, a Delaware corporation with its office and principal place of business in New York City, New York. Lorillard was and presently is in the business of selling cigarettes to various agencies of the United States Department of Defense for re-sale on military bases of the Armed forces throughout the world.

6.  AAFES and NEXCOM are two Government agencies governed by the rules and regulations of the Department of Defense. They are not named "parties" to this action, but they both are the Government agencies to which the false claims were submitted. NEXCOM is an acronym for the Naval Exchange Service Command in Norfolk, Virginia. AAFES is an acronym for the Army & Air Force Exchange Service in Dallas, Texas. The Navy Exchange Service Command (NEXCOM), headquartered in Hampton Roads, Virginia is an agency, department, section or division  of the Department of Defense and it operates the worldwide Navy Exchange System. The Army & Air Force Exchange Service Command (AAFES) is an agency, department, section or division of the Department of Defense and operates the worldwide Army and Air Force Exchange System and is headquartered in Dallas, Texas.. As components of the Supply Systems Command responsible for resale programs, the mission of both AAFES and NEXCOM is to provide goods and services to authorized customers in the military exchanges for which they serve. In this capacity, both AAFES and NEXCOM are retailing operations that provide products and a variety of services to the men and women of the Armed Forces, with special emphasis on active duty personnel. As instrumentalities of the U.S. Government, AAFES and NEXCOM are subject to directives issued by the Department of Defense.

7.  Both of these departments or agencies in the Department of Defense are staffed by employees of the Federal Government, and both departments serve, among other things, as the cigarette

5

buyers in the Department of Defense for the United States Army Exchanges, the United States Air Force Exchanges, and the United States Navy Exchanges.

## JURISDICTION AND VENUE

8. The Counts in this complaint all arise under 31 U.S.C. §3729 and 31 U.S.C. §3730, et seq., also known as the "False Claims Act."

9. Jurisdiction is conferred on this Court by 31 U.S.C. §3730(b)(1) et seq., 31 U.S.C. §3732(a), and by 28 U.S.C. §1331 because this civil action arises under the laws of the United States.

10. Venue is properly laid in the District of Columbia because the Defendants are multi-national corporations and owners of businesses and subsidiaries involved in the business of cigarette manufacturing, which manufacturers have contracted with the Government of the United States, and are/were doing business in this District. The Plaintiff United States of America through its agency the Department of Defense, which Department administers the foreign sales of cigarettes on military bases overseas through its military exchange system, has its principal "place of business" located in the District of Columbia.

## CLAIMS

11. Anthony Oliver, the Relator, is the President and CEO of MBIC, a tobacco company duly registered as a corporation in the state of Illinois, with offices and principal place of business in Chicago, Illinois.

12. In that capacity, while engaged in competition with the Defendants for the sales of MBIC's cigarettes on foreign military installations, the Relator Anthony Oliver learned that Philip Morris, R. J. Reynolds, and Lorillard, referred to herein as the Defendant tobacco companies, were all

6

grossly overcharging on the sales of cigarettes to military exchanges overseas. The Defendants, all of which, individually and as agents and or subsidiaries of the remaining Defendants as herein noted, had contracted with the United States Government to sell cigarettes to various agencies of the United States Department of Defense for re-sale on military bases of the Armed Forces throughout the world. These Defendants engaged in a massive scheme that used the (below described) "Master Settlement Agreement" as a device for deceiving the military buyers of cigarettes into believing that the Defendants were obligated to make certain payments in connection with cigarette sales on US Military bases <u>Overseas</u>.

13. The process of submitting False Claims occurred in the following manner: Under the terms of the tobacco settlement as set forth in the Master Settlement Agreement (the MSA) that was executed in November, 1998, the Defendant tobacco companies imposed price increases to the cost of <u>all</u> cartons of cigarettes in order to finance their obligations under the tobacco settlement.

14. The life span of the Master Settlement agreement is a twenty year period, beginning in November of 1998 and running through to November of 2018.

15. The price increases were initially set in the amount of $4.65 per carton, and, over the past ten years to the present date - have increased to $5.00 per carton – on both domestic and foreign sales of cigarettes.

16. Under the terms and conditions of the tobacco settlement, when these additional revenues were collected by the tobacco companies, they were to be deposited to a private organization called the National Association of Attorneys General, (hereinafter referred to as NAAG), and the NAAG would then distribute these payments on a pro rata basis to the 46 states that were signatories to the Master Settlement Agreement.

17. But there are two different categories of sales to the United States military – OCONUS transactions, which take place overseas, and CONUS transactions, which take place in the continental United States. OCONUS and CONUS purchase orders are issued separately.

18. Following the November, 1998 signing of the MSA tobacco settlement, the Defendant tobacco companies – the vendors to the United States - immediately applied the $4.65 per carton increase across the board, to all sales of cigarettes to the military - to OCONUS (for export overseas) transactions at the same time the price increase was applied to CONUS (domestic) transactions, and they have been doing it ever since.

19. But the imposition of MSA payments to NAAG under the terms outlined in the settlement - by the signatory manufacturers on the sales of cartons of cigarettes - tracks with, and is directly tied to, the obligation for the payment of the Federal Excise Tax on the sales of those cigarettes.   In other words, where the Federal Excise Tax applies, MSA payments are owed, and where the Federal Excise Tax does not apply, there are no MSA payment obligations.

20. It thus is understood that pricing from the tobacco manufacturer/vendors to customer (whether the customer is the US Military, a domestic distributor, a self stamping retailer, whoever) includes taxes and fees the manufacturer/vendors are required to pay.

21. Because no Federal Excise Tax is due on military sales abroad, or on civilian sales abroad, MSA payments are not due on those sales, because the sale of cigarettes to the Department of Defense on Military bases Overseas, as well as civilian sales overseas, do not fall within the obligations for payment under the Master Settlement Agreement.

22. But the Defendants made no distinction between foreign and domestic sales to the Department of Defense as they were selling their cartons of cigarettes to the military at AAFES and at NEXCOM. These Defendant/tobacco vendors imposed the same price increase of $4.65 per

8

carton (now $5.00 per carton) on <u>both</u> foreign and domestic sales of cartons of cigarettes to the United States military exchanges.  In doing so, they knowingly submitted claims to the United States that they knew to be false.

23. And because of the Defendants' deception, the Military buyers – the officials and employees of the Department of Defense in AAFES and NEXCOM - have been accepting and paying in good faith since 1998 the price increase by the Defendants of $4.65 and now $5.00 per carton of cigarettes that were re-sold on US Military bases abroad.

24.  The Defendant tobacco companies have been pocketing the $4.65 to $5.00 on every carton of cigarettes sold overseas over the past ten years, all in pure extra profit to the Defendants.

25. The Defendant tobacco companies at the executive level knew MSA payments were not obligated for US Military Exports.

26. And, while the Defendant tobacco vendors began their overcharging scheme by taking advantage of the impression that the proceeds from the additional $4.65 to $5.00 charged per carton sold were to be forwarded to the NAAG as part of the tobacco settlement.  But money from this overbilling never was forwarded to the NAAG.  Instead, the Defendants pocketed it

27. During this ten year period since the signing of the tobacco settlement, the Defendant tobacco vendors have been charging their non military civilian customers overseas a lower price per carton.  In other words, the civilian buyers of cigarettes overseas have not been paying the higher prices for cartons of cigarettes for the past ten years that the military buyers overseas have been paying.  Their price stayed the same, before and after the signing of the MSA. This was because the civilian buyers overseas continued to purchase cigarettes from the Defendants at the lower charge per carton reflected in the non payment of Federal Excise Taxes on sales abroad noted below in C.F.R. Title 7.

28. The deception by the Defendants has resulted in these cigarette manufacturers fraudulently obtaining wind-fall profits since the end of 1998, and the deception continues to this day.

29. The Defendant tobacco companies thus have submitted False Claims to the United States in the following manner:   They – the vendors of tobacco to the United States - deceived the Government buyers into believing that they (the defendant companies) were obligated to make the MSA payments on cigarette sales destined for re-sale on US Military bases abroad, and so the military buyers allowed the price increase on sales to the overseas military bases. Thus, the Defendants knowingly and deliberately applied a price increase on the pretext that MSA payments were obligated on cigarette sales to the Department of Defense destined for re-sale on Military bases abroad, when they knew there was no such obligation.

30. The Defendants thus falsely obtained from the United States Government payments to which they were not entitled, engaged in the fraudulent administration of the Master Settlement Agreement, and/or exploited the agreement to add a price increase on false representations that the Military buyers accepted in good faith.

31. With the aforesaid violations of the False Claims Act, the Defendants caused the Government of the United States the damage hereinafter described.

## DEFENDANTS' FALSE CLAIMS

### FIRST COUNT
### Under 31 U.S.C. § 3729(a)(1) of the False Claims Act
### the Defendants Knowingly Presented to Officers or Employees of the United States
### Government, or Members of the Armed Forces of the United States,
### False or Fraudulent Claims for Payment

32. Paragraphs 1 through 31 are incorporated and made corresponding paragraphs herein.

10

33. Payments to the National Association of Attorneys General (NAAG) under the Master Settlement Agreement are based on the tobacco manufacturers' obligations to pay Federal Excise Taxes outlined in the Master Settlement  (MSA Sec. IX(i)(2)).

34. The MSA, in Sec. II(z) defines this obligation as "a Tobacco Product Manufacturer's respective share (expressed as a percentage) of the total number of individual cigarettes sold in the fifty United States, the District of Columbia and Puerto Rico during the applicable calendar year, as measured by excise taxes collected by the Federal government..." (emphasis added).

35. Thus, a signatory to the Master Settlement Agreement owes MSA payments for all its sales domestically – (emphasis added) in the fifty States, DC, and Puerto Rico – because this is where the Federal Excise Taxes are collected and paid when the cigarettes are sold.

36. C.F.R., Title 27 in Chapter 1 deals with Alcohol and Tobacco Tax that must be paid to the Department of the Treasury, and it sets forth regulations governing the authority and the procedures by which manufacturers of cigarettes will escape the imposition of the sales tax on tobacco products sold *abroad* (the OCONUS sales on military bases overseas).

37. C.F.R., Title 27, § 44 deals with the Exportation of Tobacco Products and Cigarette Papers and tubes "without payment of tax"(emphasis added) or with drawback of tax.  Subpart A deals with the "Scope of Regulations" as follows:

> § 44.1  Exportation of tobacco products, and cigarette papers and tubes, without payment of tax, (emphasis added) or with drawback of tax.
> This part contains the regulations relating to the exportation (including supplies for vessels and aircraft) of tobacco products and cigarette papers and tubes, without payment of tax; the qualification of, and operations by, export warehouse proprietors; and the allowance of drawback of tax paid on tobacco products, and cigarette papers and tubes exported.

38. § 44-66 describes "Relief from liability for tax:"

11

> A manufacturer of tobacco products or cigarette papers and tubes or an export warehouse proprietor is relieved of the liability for tax on tobacco products, or cigarette papers or tubes upon providing evidence satisfactory to the appropriate TTB officer of exportation or proper delivery. The evidence must comply with this part. Such evidence shall be furnished within 90 days of the date of removal of the tobacco products, or cigarette papers or tubes: Provided, That this period may be extended for good cause shown.

39. § 44-202 describes the process by which the tobacco manufacturers go about proving their exemption:

> To officers of the armed forces for subsequent exportation.
>
> Where tobacco products, and cigarette papers and tubes are removed from a factory or an export warehouse for delivery to officers of the armed forces of the United States in this country for subsequent shipment to, and use by, the armed forces outside the United States, the manufacturer or export warehouse proprietor making the removal shall forward a copy of the notice of removal, Form 5200.14, to the officer at the base or installation authorized to receive the articles described on the notice of removal. Upon execution by the armed forces receiving officer of the certificate of receipt on the copy of the notice of removal, he shall return such copy to the manufacturer or export warehouse proprietor making the shipment for filing with the appropriate TTB officer.
>
> (72 Stat. 1418, as amended; 26 U.S.C. 5704). § 44.202.

40. Thus, MSA payments by these Defendant/tobacco vendors are not obligated on the sale of cigarettes so long as no FET is due on such sales. Sales of tobacco on overseas military base exchanges, as well as sales to civilian buyers, are not FET-paid, so they are not to be reflected in the tobacco companies' "Market Share."

41. Sales by the Defendant vendors to overseas military bases and to civilian buyers overseas - which are properly marked and documented as exported, and which product is sold on the foreign

12

military bases as well as to civilian buyers, are exempt from the federal excise tax, and thus also are exempt from the provisions of the Master Settlement Agreement.

42. The tobacco buyers at the major exchange systems (AAFES for the Army and the Air Force, and NEXCOM for the Navy) are employees of the Department of Defense and career buyers for these service exchanges.

43. A critical component of the exchange program, for both contract vendors and the contract buyer (the United States Government), is pricing. The Government seeks and demands to be the most favored customer of each vendor who does business with the United States and the Department of Defense.

44. The most favored customer is a customer or category of customers that receives the best discounts from the vendor's commercial price list when purchasing quantities comparable to the Government's under similar terms and condition. The AAFES and NEXCOM negotiators seek to obtain discounts from the vendor's commercial price list which are equal to or greater than the vendor's most favored customer discounts.

45. Each tobacco vendor under contract with the Department of Defense was required to certify that the price offered to the Government was equivalent or more favorable than the price it gave to other customers. The duty to sell cartons of cigarettes to the Department of Defense for the best price was on-going through the life of the contract. And after the contract was awarded, if the Defendant tobacco vendor gave a non-Government customer a better pricing structure, then the Government was entitled to a retroactive price adjustment to restore the Government to its own position of most favored customer.

46. The Defendants, as vendors to the Department of Defense, were governed, in setting their prices, by the rules and regulations for procurement mandated by the Department of Defense and its departments and agencies.

47. The rules and regulations for procurement established by the Air Force Exchange System (AAFES) are as follows:  Under the terms, conditions and requirements for procurement set forth in the controlling document of AAFES - the Retail Agreement (dated November, 1995), in the *General Provisions* set forth in *Supplier Requirements*, Section 3.a. Prices, the Contractors (the Defendant tobacco vendors) – warrant(ed) that, during the contract, the net price to AAFES ...for each item purchased "will be as favorable as, or better than the price the item is being sold by the contractor to other customers under the same or similar conditions and in the same general geographic area pursuant to agreements made during the same period."

48. Further, Section 3a. provided "In the event the contractor subsequently agrees to sell the item to another customer at a lower price, contractor is obligated to promptly offer the lower price, in writing, to the contracting officer."

49. Further, under Section 3. b. "In the event the contractor subsequently extends special offers or other special terms to other customers, the contractor is obligated to promptly extend them under the same conditions in writing to the contracting officer."

50. In the Navy Exchange System, the same "best price" and "most favored customer" terms and conditions also were required. The procurement policy for corporate vendors in contracting with NEXCOM is set forth in the *General Provisions, Publication Number 61*, of the Navy Exchange Service Command, effective 1 April, 1999.

51. In Section C. 2. of the provisions titled "Contractor's Warranty," the following terms and conditions are mandated for any vendor/Contractor doing business with NEXCOM:

"Contractor's Price Warranty. A. Most Favored Customer. The Contractor certifies that prices, terms and conditions offered under this contract, including consideration of any discount, rebate arrangements, do not exceed prices being charged the contractor's most favored customer or other military exchange for like items."

52. Continuing the *Contractor's Warranty*:: "Subsequent Reductions"  "If the contractor voluntarily extends voluntary price reductions, promotions or other offers or other terms to other customers, the contractor is obligated to promptly extend them to this officer."

53. In addition, Section C 3 provides another commercial warranty:  "The contractor agrees that the items or services provided shall be covered by the most favorable commercial warranties extended to its customers for similar items or services."

54. When the Defendant tobacco vendors submitted claims for payment to the Government, they made implicit representations that they had complied with the above stated procurement requirements of their contracts with the Department of Defense through AAFES and NEXCOM.

55. They submitted false claims when they certified that their Contractor's prices, terms and conditions offered under their contracts with AAFES and NEXCOM, including consideration of any discount, rebate arrangements, did not exceed prices being charged the contractor's most favored customer or other military exchange for like items, when in fact the prices for these cartons of cigarettes did exceed - at $5.00 per carton sold - those prices that the Defendants were charging their civilian most favored customers overseas.

56. For the past ten years the Defendants sought and received payments as if they had fully performed the terms and conditions of their contracts.  When the Defendants continued to voluntarily extend the lower price per carton of cigarettes sold overseas to their civilian customers while not extending the same reduction in price per carton to the AAFES and to NEXCOM

15

military exchanges overseas, the Defendants violated the terms and conditions and warranties of their contractual obligations for procurement set forth by the United States Government through the Department of Defense.

57. These Defendants repeatedly misstated, over the past ten years, material facts relating to the surcharge at (now) $5.00 per carton, when they knew that the surcharge did not apply to overseas (OCONUS) sales of cigarettes on military bases of the United States Armed Forces.

58. After warranting that, during the contract, the net price to AAFES and to NEXCOM for each carton of cigarettes purchased would be as favorable as, or better than, the price per carton the cigarettes were being sold by the Defendants to their "most favored" (civilian) customers overseas, the Defendant tobacco vendors sold to civilian buyers overseas cartons of cigarettes at the lower price per carton, and they didn't offer the same favorable "best price" to AAFES and NEXCOM that they had charged their "most favored" civilian customers.

59. Nor did the Defendant tobacco vendors, after selling the cartons of cigarettes to other, non military civilian customers overseas at the lower prices, promptly offer the same lower prices per carton in writing to the contracting officers of AAFES and NEXCOM on OCONUS transactions, nor did they offer any "retroactive price adjustments" they were required to offer.

60. Instead, they continued to maintain the same inflated price per carton.for OCONUS sales as they did for CONUS sales of cigarettes to the military.

61. The Defendant tobacco vendors thus knowingly failed to perform material requirements of their contracts with the Government, and in doing so violated the terms and conditions established for contractors and vendors to AAFES and NEXCOM under the rules, regulations and conditions for doing business with the Department of Defense.

62. Two civilian Government buyers at AAFES and NEXCOM manage the purchase of millions of dollars of cigarettes annually, and when the Master Settlement Agreement was signed in 1998, the buyers of tobacco for AAFES and NEXCOM accepted on good faith the above described deception and never examined whether the price increases were properly instituted or not. And when pricing on these overseas sales was reviewed once per year, the deception just kept rolling along.

63. On the deception that MSA payments were obligated on exports to US Military bases overseas (OCONUS), the military at these exchanges – AAFES and NEXCOM - have been overpaying the Defendant tobacco vendors by $4.65 to 5.00 per carton on all these cigarette purchases since 1998.

64. The Defendants, in collecting for pure profit the increases in price per carton from the United States to which they were not entitled, and in presently continuing to collect these windfall profits, violated the terms and conditions of the contracts that were negotiated with the Department of Defense of the Federal Government.

65. Through the aforesaid actions, the Defendants Philip Morris Incorporated, (now Altria Group, Inc.,), R. J. Reynolds Tobacco Company, (which merged with the Defendant British American Tobacco and operates under the name of Brown & Williamson Tobacco Corporation), and Lorillard Tobacco Company, the wholly owned subsidiary of the Defendant Loews Corporation through its subsidiary the Carolina Group, knowingly made, used and caused to be made, and knowingly submitted or caused the submission of false or fraudulent claims for payment to the officials, employees and/or agents of the United States Government and knowingly made or caused to be made a false record or statement to get a false or fraudulent claim paid or approved by the Federal Government.

66. The resulting damages and avoidable costs are very real and measurable. For the past ten years, although the Defendant tobacco companies knew that overseas purchases of cigarettes by the military bases were exempt from this (presently) $5.00 per carton increase in price per carton, they nonetheless charged the extra $5.00 per carton, and, by not turning these sums over to the Attorneys General for the states that had signed the MSA, pocketed millions of dollars for pure profit.

67. The exact number of cartons purchased by AAFES-OCONUS alone, from the three Defendants for the 52 week period ending September 2007, is as follows: Philip Morris sold 1,623,786 cartons of cigarettes overseas to AAFES-OCONUS, (the purchasing agent for the Department of Defense for overseas purchases), R. J. Reynolds sold 1,176,793 cartons to AAFES-OCONUS, and Lorillard sold 26,192 cartons of cigarettes to AAFES-OCONUS.

68. Thus, using 2007 sales as a basis for estimating the sales during the ten year period since the MSA was signed in 1998, the Defendant Philip Morris sold approximately 16,237,086 cartons of cigarettes, and was overpaid by the United States a total of $81,185,430. This figure, when multiplied times three as called for under the False Claims Act, brings the total False Claims damages and penalties assessed against Philip Morris to $243,556,290, and, over twice this amount if the False Claims continue through the expiration date of the Master Settlement Agreement.

69. Using the same 2007 sales by the Defendant R.J. Reynolds as a basis for estimating its sales during the ten year period since the MSA was signed in 1998, R. J. Reynolds sold approximately 11,767,930 Cartons and was overpaid by the United States a total of $58,839,630. This figure, when multiplied times three as called for under the False Claims Act, brings the total False Claims damages and penalties assessed against R. J. Reynolds to $176,518,950, and, over twice this

amount if the False Claims continue through the expiration date of the Master Settlement Agreement.

70. Finally, using the same sales in 2007 by the Defendant Lorillard as a basis for estimating the sales during the ten year period since the MSA was signed in 1998, Lorillard sold approximately 261,920 Cartons and was overpaid by the United States a total of $1,309,600. This figure, when multiplied times three as called for under the False Claims Act, brings the total False Claims damages and penalties assessed against Lorillard to $3,928,800, and over twice this amount if the False Claims continue through the expiration of the Master Settlement Agreement.

71. Thus, on AAFES (OCONUS) sales alone, this brings a total of $424,004,040 in damages and penalties imposed under the False Claims Act against the Defendant tobacco companies arising from violations of the terms and conditions of their contractual obligations to the Department of Defense of the United States.

72. As far as NEXCOM-OCONUS is concerned, the sales of cigarette cartons to NEXCOM (the purchasing exchange for the Navy Department for sales on the overseas exchanges on U.S. Navy bases) is approximately 10% of the purchases that were made by AAFES, the larger purchasing exchange. This would result in False Claims damages on sales to NEXCOM estimated in the amount of $42,400,000.

73. This brings an aggregate in civil damages and penalties of approximately $446,000,000 for the False Claims Act violations by the Defendant tobacco manufacturing companies. Further, the amount in damages will be approximately twice this amount if the False Claims Act violations continue through the expiration of the Master Settlement Agreement.

74. Additionally, it must be noted that, if one estimates that a penalty should be imposed for each occurrence in which a False Claim occurred - at $5,000 or the maximum penalty of $10,000.00

19

per occurrence - for each sale of every carton of cigarettes in which the surcharge of $5.00 was imposed, the figures are as follows (keeping in mind again, that just the AAFES figures are being used, and not the numbers for overseas purchases by NEXCOM.)

    a.   For Philip Morris, there were 1,623,786 cartons sold to AAFES with the falsely imposed surcharge. Over a ten year period, this brings a total of 16,237,860 cartons sold. Multiplying this figure times the $10,000 penalty brings a total of $16,237,860,000 in penalties.

    b.   For R. J. Reynolds, there were 1,176,793 cartons sold. Over a ten year period, this brings a total of 11,767,930 cartons sold. Multiplying this figure times the $10,000 penalty brings a total of $11,767,930,000 in penalties.

    c.   Lorillard, at 26,192 cartons, brings a total of $261,920,000 in penalties.

75. Over the past ten years, the United States Government, unaware of the falsity of the claims and/or statements made by the Defendants, and in reliance on the accuracy thereof, paid the Defendant millions of dollars for these fraudulent and false claims under the aforesaid contracts with AAFES and NEXCOM through the Department of Defense.

76. The United States Government has been damaged as a result of the Defendants' violations of the False Claims Act as set forth in the preceding paragraphs, and the Defendants have knowingly violated 31 U.S.C. §3729 et seq. and damaged the United States Government in an amount to be determined at trial.

**WHEREFORE, RELATOR**, on behalf of the **UNITED STATES OF AMERICA**, prays, under the First Count of the Complaint:

(a) That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions,

plus a civil penalty of $5,000 - $10,000 for each action in violation of 31 U.S.C. § 3729 et seq., and the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(b) That the Relator be awarded all costs incurred, including reasonable attorneys fees;

(c) That in the event that the United States of America proceeds with this action, the Relator be awarded an amount for bringing this action of not more than 25% but at least 15% of the proceeds of the action or settlement of the claim;

(d) That in the event that the United States of America does not proceed with this action, that the Relator be awarded an amount for bringing this action that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not more than 30% and not less than 25% of the damages or settlement proceeds recovered by the United States of America;

(e) That the Relator be awarded prejudgment interest;

(f) That a trial by jury be held on all issues;

(g) That the United States of America and Relator receive all other relief, both at law or equity, to which they reasonably may be entitled.

**UNITED STATES OF AMERICA** *ex rel.*
**ANTHONY OLIVER**

By _____
JOHN F. MURPHY
1324 Asylum Avenue
Hartford Connecticut 06105-6011
Fed. Bar No. CT0004
Tel. No. (860) 233-9946
Fax. No. (860) 523-5065
e-mail: john.murphy18@comcast.net

21

# Certification

I the undersigned, hereby certify that copies of the **AMENDED COMPLAINT** were sent, via Federal Express (to Ms. Weinstain) and via U.S. Postal Service, Priority Mail (to Ms. McMahon) on September 12, 2008 to:

Laurie Weinstein
Assistant United States Attorney
555 Fourth Street, N.W., Room E4820
Washington, D.C. 20530

Linda McMahon, Attorney
Commercial Litigation Branch, Civil Division
U.S. Department of Justice
Post Office Box 261
Washington, D.C. 20044

John F. Murphy
Attorney for Relator
Anthony Oliver