## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES *ex rel.*
ANTHONY OLIVER,

        Plaintiff,

v.

PHILIP MORRIS USA INC.,

        Defendant.

**Civil Action No. 08-0034 (CKK)**

## MEMORANDUM OPINION
(June 13, 2013)

The plaintiff/relator in this case, Anthony Oliver ("Oliver"), brings suit against Defendant Philip Morris USA Inc. ("Defendant") pursuant to the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729 *et seq.* Presently before the Court is Defendant's [53/62] Motion to Dismiss.[1] Upon consideration of the parties' submissions, the applicable authorities, and the record as a whole, the Court shall GRANT Defendant's motion and dismiss this case for lack of subject matter jurisdiction.[2]

---

[1] Defendant timely filed its original motion to dismiss on July 27, 2012. *See* ECF No. [53]. On October 10, 2012, with leave of the Court, Defendant re-filed the same motion, with the only modifications being the correction of an address in the signature block and a corrected caption that reflects Defendant's request for oral argument on the motion. *See* ECF No. [62].

[2] While the Court renders its decision on the record as a whole, its consideration has focused on the following documents: Pl.'s Second Am. Compl. ("Compl."), ECF No. [49]; Def.'s Mem. of Law in Supp. of Def. Philip Morris USA Inc.'s Mot. to Dismiss ("Def.'s Mem."), ECF No. [53-1]; Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. [59-1]; and Def.'s Reply in Supp. of Def. Philip Morris USA Inc.'s Mot. to Dismiss ("Def.'s Reply"), ECF No. [60]. In an exercise of its discretion, the Court finds that holding oral argument on the instant motion would not be of assistance in rendering a decision. *See* LCvR 7(f).

# I. BACKGROUND

Oliver, President and CEO of Medallion Brands International Co., a tobacco company, filed this *qui tam* suit under seal on January 4, 2008.  ECF No. [1].  On September 13, 2011, the United States advised the Court that it would not intervene in the case.  ECF No. [28]. In the Second Amended Complaint, ECF No. [49] (hereinafter the "Complaint"), which is the operative complaint in this action, Oliver alleges that Defendant violated the FCA by falsely certifying that it was providing the United States military with the best price for its cigarettes.

Specifically, Oliver alleges that for a number of years and at least from 2002 until the time the Complaint was filed, Defendant supplied the Navy Exchange Service Command ("NEXCOM") and the Army and Air Force Exchange Service ("AAFES") with cigarettes. Compl. ¶ 20.  Oliver alleges that Defendant's sales of cigarette products to NEXCOM and AAFES were subject to "most favorable customer" warranties of NEXCOM's and AAFES's contracting requirements.  *Id.* ¶ 21.  According to Oliver, during all times relevant to the Complaint, NEXCOM's contracting requirements provided, in pertinent part: "The Contractor certifies that prices, terms and conditions offered under this contract, including consideration of any discount rebate arrangements, do not exceed prices then being charged the Contractor's most favored customer or another military exchange for like items." *Id.* ¶ 14.  Similarly, for most of the period covered by the Complaint, AAFES's contracting requirements required a vendor to provide the following price warranties:  "The Contractor warrants that during this contract, the net price to AAFES (considering each unit price, discounts, allowances, co-op advertising, rebates, and other terms and conditions) for each item purchased will be as favorable as, or better than, the price the item is being sold by the Contractor to other customers under the same or similar conditions and in the same general geographical area pursuant to agreements made

during the same period.   In the event the Contractor subsequently agrees to sell the item to

another customer at a lower price, the Contractor is obligated to promptly offer the lower price,

in writing, to the Contracting Officer."  *Id.* ¶ 16.[3]

Oliver alleges that at all times mentioned in the Complaint, Defendant has, through the

submission of its purchase orders and other contract documents (both of which Oliver alleges

incorporated the "most favorable customer" warranties, *id.* ¶ 22), knowingly represented to

NEXCOM and AAFES that the prices it was charging for its cigarette products complied with

the "most favorable customer" warranties.  *Id.* ¶ 23.  However, he claims that, throughout the

period covered by the Complaint, Defendant has in fact "knowingly sold cigarette products

identical to the cigarettes sold to AAFES and NEXCOM to affiliates of defendant – including,

but not limited to, Philip Morris Duty Free, Inc. and Philip Morris International, Inc. – at prices

lower than the prices such cigarettes were sold to NEXCOM and AAFES."  *Id.* ¶ 25.  Oliver

further contends that Defendant sold these cigarette products to its affiliates, knowing that its

affiliates were, in turn, re-selling the cigarettes to foreign purchasers in markets similarly situated

to NEXCOM and AAFES at prices lower than the prices charged to NEXCOM and AAFES.  *Id.*

Accordingly, Oliver alleges that Defendant falsely certified compliance with the "most

favorable customer" warranties and therefore violated the FCA in two ways – first, by selling its

cigarette products to its affiliates (whom Oliver claims have always been treated by Defendant as

---

[3] This price warranty was effective from November 1995 until December 2007.  In December 2007, the price warranty was modified as follows: "The prices for products provided by the Contractor in this contract are hereby warranted by the Contractor to be comparable to, or more favorable to AAFES than, the comparable prices, terms, and conditions that have been offered by the Contractor to any of its customers.  If the Contractor offers to industry or government at large price decreases on the products and services included in this contract, which become effective during the term of the contract, the price decreases will be passed on to AAFES to any portion of contract performance not completed at time of implementation of the price decreases by the Contractor, to the extent the decreased prices would be lower than the prices in this contract. . . ." *Compl.* ¶ 19.

independent companies) for less than it was selling to the military, and/or second, by knowingly using its affiliates as conduits through which to sell its cigarettes to the civilian duty free market for less than it was selling to the military. *Id.* ¶ 29; Pl.'s Opp'n at 2. Either way, Oliver alleges that, throughout the period covered by the Complaint, Defendant has charged NEXCOM and AAFES millions of dollars more, annually, for its cigarette products than has been paid by either Defendant's affiliates purchasing such products or foreign purchasers buying such products from Defendant's affiliates. Compl. ¶ 29. While Oliver provides as an "example" a single allegation of an alleged price discrepancy between the cost of Defendant's cigarettes in the civilian duty-free market in American Samoa and the price at which the same cigarettes were purchased by NEXCOM for the Navy on Guam, *see id.* ¶ 26, the Complaint otherwise speaks in very broad terms and contains neither geographic limitations nor specific allegations regarding the timing, number, or other circumstances surrounding the alleged execution of the relevant contracts or purchase orders. *See generally id.* It is Oliver's position that, because he has not yet been afforded discovery in this matter, he cannot be expected to provide greater specification of the details of the allegedly fraudulent purchase orders at this time. *Id.* ¶ 30.

## II. LEGAL STANDARDS

Defendant moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief. The Court must address Defendant's jurisdictional challenge before the merits of the case may be considered. *See Vt. Agency of Nat'l Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 778 (2000) ("Questions of jurisdiction, of course, should be given priority – since if there is no jurisdiction there is no authority to sit in judgment of anything else."). Because the Court concludes that this case must be dismissed

under 12(b)(1) for lack of subject matter jurisdiction, it need not address Defendant's alternative argument under 12(b)(6).

A court must dismiss a case pursuant to Rule 12(b)(1) when it lacks subject matter jurisdiction.  In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.").  "At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact."  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005).   In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).

The FCA prohibits fraudulent claims for payment from the United States, § 3729(a),[4] and authorizes private individuals (referred to as "relators") to bring civil actions on behalf of the Government based on their knowledge of fraud committed against the Government, *id.* § 3730(b)(1).   The FCA incentivizes these so-called *qui tam* actions by relators with inside information by permitting those relators to share in the Government's recovery of the funds that were the subject of the false claim or claims. *See id.* § 3730(d).  However, the ability of a private

---

[4] Unless otherwise indicated, all section references are to Title 31 of the United States Code.

party to bring such actions is limited by the "public disclosure" provision of the FCA, which divests courts of subject matter jurisdiction over suits alleging facts that were publicly disclosed in certain specified forums before the suit was filed, where the individual is not an "original source" of that information. *See id.* § 3730(e)(4)(A).[5] It is this "public disclosure" bar on which Defendant's Rule 12(b)(1) motion relies.

The version of the FCA in effect when Oliver filed his Complaint provided, in pertinent part, that "[n]o court shall have jurisdiction over an action … based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media, unless … the person bringing the action is an original source of the information." *Id.* The D.C. Circuit has construed the statutory phrase "based upon" to mean "'supported by,' not 'derived from.'" *U.S. ex rel. Schwedt v. Planning Research Corp., Inc.*, 39 F. Supp. 2d 28, 33 (D.D.C. 1999) (quoting *U.S. ex rel. Findley v. FCP-Boron Employees' Club*, 105 F.3d 675, 682 (D.C. Cir. 1997)); *accord U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 47 (D.D.C. 2007). In other words, the public disclosure bar "encompass[es] situations in which the relator's complaint repeats what the public already knows, even though [he] had learned about the fraud independent of the public disclosures." *Findley*, 105 F.3d at 683. *See also U.S. ex rel. Settlemire v. Dist. of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999) ("Under this regime, jurisdiction is lacking whenever the relator files a complaint describing allegations or transactions substantially similar to those in the public

---

[5] The public disclosure bar was amended on March 23, 2010, but the Supreme Court held that the amendments do not apply retroactively. *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 130 S. Ct. 1396, 1400 n.1, 176 L. Ed. 2d 225 (2010). Accordingly, the version of 31 U.S.C. § 3730(e)(4) that was in effect at the time Oliver filed his Complaint applies to the instant action.

domain, regardless of the actual source for the information in the particular complaint.") (citations and internal quotation marks omitted).

The FCA excepts from its public disclosure jurisdictional bar situations where the relator is an "original source" of the relevant information. An "original source" is a person who has "direct and independent knowledge" of the information on which the allegations in his Complaint are based and who provided that information to the Government before filing suit. *Id.* § 3730(e)(4)(B); *see also U.S. ex rel. Green v. Serv. Contract Educ. and Training Trust Fund*, 843 F. Supp. 2d 20, 30 (D.D.C. 2012).[6] "The D.C. Circuit has defined 'direct' knowledge as knowledge 'marked by absence of intervening agency,'" *Green*, 843 F. Supp. 2d at 30 (citing *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 656 (D.C. Cir. 1994)), "or 'first-hand knowledge,'" *id.* (citing *Findley*, 105 F.3d at 690), and "independent knowledge" as "'knowledge that is not itself dependent on public disclosure,'" *id.* (citing *Quinn*, 14 F.3d at 656).

Together, the public disclosure bar and original source exception reflect congressional consideration of the "optimal balance" between "encouraging suits by 'whistle-blowing insiders with genuinely valuable information' and discouraging claims by 'opportunistic plaintiffs who have no significant information to contribute of their own.'" *Id.* (citing *Quinn*, 14 F.3d at 649).

---

[6] As the Court in *Green* explained, in addition to the statutory requirement that the relator provide the information to the government before filing suit, the D.C. Circuit in *Findley* inferred a third requirement for an individual to qualify as an original source: that the individual must also "provide the information to the government prior to any *public disclosure*." *See Green*, 843 F. Supp. 2d at 30-31 (emphasis added). However, in *U.S. ex rel. Davis v. Dist. of Columbia*, the D.C. Circuit observed that recent Supreme Court precedent may have called into question this implicit pre-disclosure requirement. 679 F.3d 832, 837 (D.C. Cir. 2012). Here, because the Court finds, for reasons explained *infra* Part III.C, that Oliver failed to demonstrate that he provided the relevant information to the government before filing suit, the Court need not inquire as to whether he also failed to do so prior to the public disclosure.

## III. DISCUSSION

Here, Defendant argues that the "allegations or transactions" upon which Oliver's suit is based were the subject of public disclosure in both a civil hearing and in the news media within the meaning of section 3730(e)(4)(A) of the FCA.  Defendant also argues that Oliver does not qualify as an "original source" within the meaning of section 3730(e)(4)(B) and that therefore the FCA's public disclosure bar precludes this Court from exercising subject matter jurisdiction over this action.  For the below reasons, the Court agrees.

### A.  "Public disclosure"

Defendant attaches as an exhibit to its motion a copy of a Philip Morris USA interoffice memorandum identifying the difference between "PM USA military tax-free prices" and "PMI duty free list prices," which Defendant asserts was publicly disclosed when PM USA produced documents to the Government in *United States v. Philip Morris Inc., et al.*, Civ. A. No. 99-02496-GK  (D.D.C.), a RICO action against several large tobacco companies (hereinafter the "RICO Action").[7]  *See* Def.'s Mem., Ex. A (Mem. from Mike Madden to Jacquie Gilbert regarding MWR NAS Keflavik, Iceland, Dec. 28, 1999) (hereinafter "Interoffice Memorandum").  The Interoffice Memorandum states, in relevant part:

> Attached is a letter written by the Director, Morale, Welfare & Recreation (MWR) Department at the U.S. Naval Station in Keflavik, Iceland to a duty-free wholesaler in Norfolk, Virginia.  The MWR facility has tried, unsuccessfully, to have a duty-free wholesaler, Belkov Brothers, supply them with Philip Morris products.  Doug Nelson of PMI Duty-Free Sales has alerted PM USA Military department of this issue and has advised Belkov not to ship product to the MWR facility.
> PM USA is responsible for U.S. Military markets worldwide and is the source for product to MWR facilities.  These outlets are independent operations and not associated with our major Service Headquarters i.e. AAFES, NEXCOM.  The facility in Iceland is

---

[7] The Court's consideration of the Interoffice Memorandum is proper because, as stated *supra* Part II, "the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

a small operation and we have recommended that they source their product from the Iceland Navy warehouse.  As you can see from their letter, they are not satisfied with the support from the Navy.

*PMI Duty-Free list prices are lower than PM USA Military tax-free prices and we frequently receive inquiries from the Service Headquarters on why they can't purchase tax-free product at these lower prices.*  Our response is that PM USA is the U.S. Federal Government's source of product, and we ensure that the product conforms to the proper Surgeon General warnings.  If the MWR were able to source product from Belkov, they would have a substantial price advantage over the Navy Exchange. . . .

*Id.* (emphasis added).

Defendant argues that the pricing information in the Interoffice Memorandum qualifies as publicly disclosed "in a … civil … hearing," § 3730(e)(4)(A), as well as "from the news media," *id.*, which courts have construed to include readily accessible websites.  Specifically, Defendant explains that the Interoffice Memorandum was produced to the Government as part of civil discovery in the RICO Action, and that in December 2002 – over five years before Oliver commenced the instant suit – Defendant uploaded the Interoffice Memorandum to a publicly available, fully searchable online database created pursuant to a 1998 settlement agreement between Defendant and 46 state Attorneys General, mandating public access to documents that Defendant had produced in tobacco and health litigation.  *See* Def's Mem. at 14 & Ex. B (Philip Morris USA Public Document Site Screen Shot); *see also* http://www.pmdocs.com/Home.aspx (last visited June 5, 2013).  Defendant's document disclosure obligations under the settlement agreement were subsequently extended for an additional ten years by a 2006 order from this Court, which, *inter alia*, ordered Defendant to maintain in its online database and make searchable "all documents produced to the Government in this case."  *See United States v. Philip Morris, Inc.*, Civ. A. No. 99-02496-GK  (D.D.C.), Order #1015: Final Judgment and Remedial Order (Aug. 17, 2006), ECF No. [5733], at ¶¶ 8, 10(a)(1), 10(c).  Defendant also explains that in January 2003, the Interoffice Memorandum was independently copied to the University of

California at San Francisco's publicly-available online document archive. *See id.* & Ex. C (University of California, San Francisco Legacy Tobacco Documents Library Screen Shot); *see also* http://legacy.library.ucsf.edu/tid/epz42c00 (last visited June 5, 2013) (indicating a "Date Added UCSF" date of January 15, 2003 and a "Date Added Industry" date of December 4, 2002).

The Supreme Court has recently underscored that the channels of public disclosure specified in the FCA's public disclosure statutory bar should be construed broadly. *See Schindler Elevator Corp. v. United States ex rel. Kirk*, — U.S. —, 131 S. Ct. 1885, 179 L. Ed. 2d 825 (2011). In *Schindler*, the relator alleged that his former employer had submitted false claims for payment under its federal contracts. To support his allegations, he pointed to information that his wife had received from the Department of Labor in response to several requests for records she filed pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522. The question before the Supreme Court was whether a federal agency's written response to a FOIA request, including any records produced along with such response, was a government "report" within the meaning of the FCA's public disclosure bar. Reasoning that the "sources of public disclosure in § 3730(e)(4)(A), especially 'news media,' suggest that the public disclosure bar provides 'a broa[d] sweep,'" the Court held that it was. *Id.* at 1891 (citing *Graham County*, 559 U.S. 280, 130 S. Ct. 1396, at 1404). The Court noted that this conclusion was further supported by the drafting history of the public disclosure bar, finding that the relator's case was a "classic example of the 'opportunistic' litigation that the public disclosure bar is designed to discourage." *Id.* at 1894 (citation omitted). Specifically, the Court explained that "although [the relator] alleges that he became suspicious from his own experiences . . . working at Schindler, anyone could have filed the same FOIA requests and then filed the same suit. Similarly, anyone could

identify a few regulatory filing and certification requirements, submit FOIA requests until he discovers a federal contractor who is out of compliance, and potentially reap a windfall in a *qui tam* action under the FCA." *Id*.

Although *Schindler* concerned the meaning of government reports, the "generally broad," "wide-reaching" scope of the FCA's public disclosure bar undoubtedly requires a similarly generous application of the other categories enumerated in the statute. *See id.* at 1891. Indeed, this Circuit has held that "discovery material, when filed with the court (and not subject to protective order), is 'public[ly] disclos[ed]' in a 'civil hearing' for purposes of § 3730(e)(4)(A)'s jurisdictional bar." *Quinn*, 14 F.3d at 652; *see also id.* (rejecting the relator's argument that the word "hearing" suggests formal proceedings open to the general public and finding instead that "for purposes of § 3730(e)(4)(A), 'hearing' is roughly synonymous with 'proceeding'").

Oliver argues that the Interoffice Memorandum does not meet the Circuit's definition of publicly disclosed discovery material because it was never "filed" in Court. Pl.'s Opp'n at 17. But this is too simplistic a reading of *Quinn's* holding. While the Circuit restricted the application of the public disclosure bar to discovery material "which is *actually* made public through filing" – it immediately thereafter offered in contrast: "as opposed to discovery material which has not been filed with the court and is only *theoretically* available upon the public's request." *Quinn*, 14 F.3d at 652 (emphasis in original). The Court further stated: "[W]e doubt that the discovery process conducted between two private litigants could itself constitute a public disclosure within the meaning of [the FCA]." *Id.* The focus, therefore, is not on the "filing" of the discovery materials on the docket *per se*, but rather, on whether the discovery materials were made public as part of the civil case. Here, disclosure by way of a publicly accessible online database – which public disclosure was a condition of a settlement agreement that was

subsequently ordered extended by the very court which presided over the case in which the Interoffice Memorandum was produced, *see supra* – was "actual" and not just "theoretical," and consequently sufficient to trigger the public disclosure bar.

Alternatively, even if the Interoffice Memorandum had not been disclosed publicly in connection with a civil hearing, the Court finds that it qualifies as publicly disclosed in the "news media" given its availability online.  "The FCA does not define 'news media,' and courts that have considered the issue have construed the term to include readily accessible websites." *Green*, 843 F. Supp. 2d at 32 (holding that promotional information contained on a website of an international labor union's training organization was disclosure by "news media" under the FCA's public disclosure provision); *cf. U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*, 739 F. Supp. 2d 396, 407 (S.D.N.Y. 2010) (finding that a publicly searchable database on a city agency's website, presenting synthesized tax benefit histories for many different properties over many years, organized by block and lot number, was an administrative "report" subject to the FCA's public disclosure bar).

Oliver argues that, given the massive volume of the online databases, there was no "realistic possibility" that the disclosure would actually be seen and understood by "the public." *See* Pl.'s Opp'n at 19-22.  But Oliver cites no authority suggesting that, in addition to being publicly accessible, the disclosure must also be conspicuous or widespread, and the Court is aware of none.  *Compare, e.g.*, *U.S. ex rel. Doe v. Staples, Inc.*, Civ. A. No. 08-846, 2013 WL 1192982, *4 (D.D.C. Mar. 22, 2013) (finding that shipping data provided by a trade publisher in reports accessible from its website constituted public disclosure of information through the news media for purposes of the FCA's public disclosure jurisdictional bar).  *See also Green*, 843 F. Supp. 2d at 33 ("That the [ ] website may have been directed to a select audience, presumably

because of its subject matter, does not detract from its ready accessibility.")  (internal quotation marks and citations omitted).

For all of the foregoing reasons, the Court finds that the posting of the Interoffice Memorandum online in a public, searchable database pursuant to a settlement agreement and subsequent court order constitutes disclosure both in a "civil hearing" and in the "news media" within the meaning of the FCA's public disclosure bar.  The re-posting of the document in a text-searchable university database available to the general public likewise constitutes public disclosure in the "news media."

**B. "Based upon … allegations or transactions"**

The inquiry, of course, does not end there.  As explained *supra* Part II, the FCA's public disclosure provision bars only those *qui tam* actions that are "based upon the public disclosure of allegations or transactions."  § 3730(e)(4)(A).  Here, Oliver argues that, even if the Interoffice Memorandum was "publicly disclosed" within the meaning of the FCA, it does not contain the "allegations or transactions" of the fraudulent conduct upon which this case is based – namely, that, from 2002 to the present, Defendant has falsely certified to AAFEX and NEXCOM that it was complying with its "most favored customer" warranty.  Pl.'s Opp'n at 3.

A suit is jurisdictionally barred under the FCA's public disclosure provision if "either the allegations of fraud or the critical elements of the fraudulent transaction themselves were in the public domain." *Quinn*, 14 F.3d at 654.  An "allegation" is a "conclusory statement implying the existence of provable supporting facts," while a "transaction" is "an exchange between two parties or things that reciprocally affect or influence one another."  *Id*.  The D.C. Circuit has explained the inquiry with the following formula:

> [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential
> elements.  In order to disclose the fraudulent *transaction* publicly, the combination of X

and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed.

*Id.*

Accordingly, the "allegations or transactions" in the public domain need not "irrefutably prove a case of fraud" to trigger the jurisdictional bar, *Settlemire*, 198 F.3d at 918; rather, the central inquiry is "whether the publicly disclosed information 'could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing,'" *id.* (quoting *Quinn*, 14 F.3d at 564). "If the public disclosure could have alerted the government to the fraud, there is little value in permitting a private individual to sue, and the FCA accordingly deprives courts of jurisdiction to hear a *qui tam* action." *Green*, 843 F. Supp. 2d at 30.

Here, Oliver does not dispute that the Interoffice Memorandum discloses complaints by NEXCOM and AAFES that Defendant's then affiliate, Philip Morris International, Inc., offered lower list prices to its customers in the duty free market than Defendant offered to the military. Nor could he, as the language of the memorandum is unequivocal. *See* Def.'s Mem., Ex. A (Interoffice Memorandum) ("PMI Duty-Free list prices are lower than PM USA Military tax-free prices and we frequently receive inquiries from the Service Headquarters on why they can't purchase tax-free product at these lower prices."). Oliver also cannot dispute that this is the same disparate pricing allegation on which his Complaint is premised. *See* Compl. ¶¶ 25-27 (alleging that Defendant sold its cigarette products to affiliates of defendant, including Philip Morris International, Inc., at prices lower than the prices at which identical cigarette products were sold to NEXCOM and AAFES and that such affiliates were re-selling the cigarette products to foreign purchasers in markets similarly situated to NEXCOM and AAFES, such as civilian duty-free markets, at prices lower than those charged to NEXCOM and AAFES).

14

Instead, Oliver argues that the Interoffice Memorandum itself does not imply that there is anything wrong with the pricing disparity referenced therein.  *See* Pl.'s Opp'n at 13-15.  More specifically, Oliver argues that because the memorandum makes no reference to the "most favored customer" requirements of NEXCOM and AAFES's contracts or to Defendant's certifications of compliance with those requirements, it does not reveal any practice that is, on its face, of "questionable legality."  *Id*. at 15 (citing *Green*, 843 F. Supp. 2d at 20).  In other words, Oliver argues, there is nothing in the memorandum that "could have formed the basis for a governmental decision on prosecution" or "alerted law-enforcement authorities to the likelihood of wrongdoing."  *Id*. at 15 (citing *Quinn*, 14 F.3d at 654).

The Court finds Oliver's argument unavailing.  The memorandum plainly discloses Defendant's affiliates' practice of selling cigarettes on the duty-free market at list prices lower than to AAFES and NEXCOM, as well as the fact that AAFES and/or NEXCOM  – the very entities whom Oliver contends were defrauded by Defendant – had previously *complained* about (and were therefore necessarily aware of) this pricing differential.  This alone could be viewed as revealing "transactions" sufficient to "alert[ ] law enforcement authorities to the likelihood of wrongdoing," *Quinn*, 14 F.3d at 654.  Although the Interoffice Memorandum does not reference the reason why the pricing differential is of questionable legality (*i.e.*, the "most favored customer" certifications), the Court agrees with Defendant that the "most favored customer" provisions contained within the AAFES and/or NEXCOM's General Provisions Publications are legal requirements that the Government is presumed to know.  *See* Def.'s Reply at 8.  After all, they are the Government's *own* requirements.  *See, e.g.*, *Schindler*, 131 S. Ct at 1890.[8]  Further,

---

[8] Defendant also argues that, well before the filing of Oliver's Complaint, the publications were available not only to vendors doing business with the exchanges, as Oliver himself concedes, *see* Compl. ¶ 10-19; Pl.'s Opp'n at 22, but also to the broader public. *See* Def.'s Mem. at 12.

the fact of Defendant's certifications with the "most favored customer" requirements – by way of the purchase orders and contracts pertaining to its sales – can be inferred by the simple fact that AAFEX and NEXCOM continued to purchase Defendant's cigarette products during the time covered by the Complaint.   Oliver himself seems to acknowledge that he has no personal knowledge of the certifications, but instead, appears to rely on this very common sense inference.  *See* Compl. ¶ 30 ("Because relator has not yet been afforded discovery in this action, he is … unable to provide greater specification of the details of each of these purchase orders at this time.").

Relator's contention that he can provide additional examples of alleged overpricing – *i.e.*, the sole comparison mentioned in his complaint between cigarettes in the civilian duty-free market in American Samoa and the price purchased by NEXCOM for the Navy on Guam, *see* Compl. ¶¶ 26-27 – does not change this Court's analysis, as it is well-established that "a relator's ability to reveal specific instances of fraud where the general practice has already been publicly disclosed is insufficient to prevent operation of the jurisdictional bar."  *Settlemire*, 198 F.3d at 919.  *See also Quinn*, 14 F.3d at 655. ("A *qui tam* action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain and the *qui tam* relator comes forward with additional evidence incriminating the defendant."); *Findley*, 105 F.3d at 688 ("'[T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the

---

Defendant cites as support the website addresses where the publications can be found.  *Id.* at 12 & nn. 6,7.  However, unlike the websites containing the Interoffice Memorandum, neither of the websites to which Defendant cites here indicate the date on which these documents were posted. Although the Court is permitted to look outside of the pleadings on a Rule 12(b)(1) motion, it declines to conclude that the fact that these publications are *presently* publicly available online necessarily means that they were so available prior to 2008.

significance of a publicly disclosed transaction or allegation.'") (quoting *U.S. ex rel. Stinson,*

*Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3rd Cir. 1991)).

      For all of the foregoing reasons, the Court finds that Oliver's Complaint describes

"transactions" "substantially similar to those in the public domain" and therefore is "based upon"

the public disclosure of those transactions within the meaning of section 3730(e)(4)(A).  *See*

*Settlemire*, 198 F.3d at 918.

## C.  Original Source

      Finally, because this suit is based upon public disclosures, to establish jurisdiction, Oliver

must demonstrate that he is an "original source" – that is, an individual with "direct and

independent knowledge" of the information on which his allegations are based who has

voluntarily provided that information to the Government before filing suit.  § 3730(e)(4)(B).  The

inquiry is whether Oliver has direct and independent knowledge of the information underlying

his *own* allegations, not the information underlying the public disclosure.  *See Green*, 843 F.

Supp. 2d at 35 (citing *Rockwell Int'l Corp. v. U.S.*, 549 U.S. 457, 470-72, 127 S. Ct. 1397, 167 L.

Ed. 2d 190 (2007)).  Oliver has failed to make such a showing.

      Oliver argues that he notified the Government, before filing suit, of the fraud and the

evidence he had underlying his claim.  Pl.'s Opp'n at 23; *see also id.*, Ex. A (Decl. of Anthony

Oliver in Supp. of Opp'n to Mot. to Dismiss ("Oliver Decl.")).  Specifically, Oliver attaches as

an exhibit an e-mail he alleges to have sent to the Department of Defense hotline on November

16, 2007, which reports, in pertinent part, that he is aware of an "on-going fraud" against the

Military Exchange Systems, which "has been perpetrated by three major tobacco companies

resulting in overpayments to these tobacco companies in the purchase of cigarettes by the

(AAFES, NEXCOM, MCX) Military Exchange Systems."  *See id.*, Ex. 1 to Ex. A (Nov. 16,

2007 e-mail regarding "Report of Fraud").  Oliver also represents that he had conversations with employees of NEXCOM and AAFES "regarding the issues set forth in [his] e-mail."  *See id.*, Ex. A (Oliver Decl.) at ¶ 5.

The foregoing showing is inadequate for two reasons.  First, Oliver has failed to show that he has "direct" knowledge – *i.e.*, "first-hand knowledge," *Quinn*, 14 F.3d at 656 – of the allegations underlying his Complaint.  The Complaint itself provides no basis whatsoever for Oliver's knowledge, and the declaration attached to his opposition brief states only that he "became aware of the false claims alleged in this action" "through [his] relationships with the United States military and [his] involvement in the sale of tobacco products to NEXCOM." Pl.'s Opp'n, Ex. A (Oliver Decl.) at ¶ 3.  Notwithstanding the direct challenge to Oliver's "original source" status briefed at length in Defendant's opening brief, Oliver makes no attempt in response to explain how, exactly, he learned of the alleged price differentials or of Defendant's participation in, or awareness of, the alleged fraudulent violations of the "most favored customer" provisions.  And his broad assertions of "relationships" with unspecified members of the military and "involvement" in the sale of tobacco products simply do not suffice. *See, e.g.*, *Green*, 843 F. Supp. 2d at 35 ("Green's general assertion that he has direct and independent knowledge 'derived through his employment' does not suffice to explain the basis of his knowledge of any elements of the alleged fraud.").  Accordingly, the Court is left with no foundation from which to infer that Oliver had the requisite "direct and independent knowledge" of the allegations underlying his Complaint.

Second, even if Oliver had been shown to have direct and independent knowledge of the information underlying his Complaint, he may only qualify as an "original source" if he "voluntarily provided the information to the Government before filing [his] action."

§3730(e)(4)(B).  Oliver has failed to satisfy this requirement as well.  This is because "a relator must qualify as an original source for each distinct kind of claim or scheme [he] alleges."  *U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 54 (D.D.C. 2007) (citing *Rockwell*, 127 S. Ct. 1397).  "It is not enough that a relator was an original source of allegations that are linked by theme and subject matter to other allegations that are based on public disclosures."  *Id*.  As Defendant correctly observes, Oliver's declaration states generally that he disclosed "*an* on-going fraud" to the Government, but does not state that he disclosed *this* fraud – that is, the fraud relating to the "most favored customer" clauses that are the subject of his Complaint.  *See* Def.'s Reply at 14.  The disclosures he describes neither mention Defendant's alleged breaches of the "most favored customer" clauses nor contain any details that may have prompted an investigation into Defendant's pricing of products sold to NEXCOM and AAFES as compared to those sold to its affiliates and/or duty-free civilian customers.  A broad accusation of "fraud" by "three major tobacco companies" that has "result[ed] in overpayments" in the "purchase of cigarettes" simply does not amount to the kind of independent information that the original source doctrine protects.  *See U.S. ex rel. Davis v. Dist. of Columbia*, 679 F.3d 832, 837 (D.C. Cir. 2012) (questioning whether letters alleging "Medicaid fraud" and "diversion of Medicare funds" were too vague to establish pre-suit disclosure but ultimately not addressing the issue because relator was able to produce another letter expressly identifying the allegations forming the basis of his complaint).  *See also, e.g.*, *.g.*, *Staples*, 2013 WL 1192982 at *5 (finding that the relator did not qualify as an "original source" because he "failed to 'allege specific facts – as opposed to mere conclusions – showing exactly how and when he … obtained direct and independent knowledge of the fraudulent acts alleged in the complaint[.]'") (citing *In re Natural Gas Royalties*, 562 F.3d at 1045 (10th Cir. 2009)).

19

In summary, Oliver has failed to demonstrate that he disclosed to the Government direct and independent knowledge of the fraud alleged in his Complaint, and he has therefore failed to show that he is entitled to the "original source" exception to the FCA's public disclosure bar.

## IV. CONCLUSION

For all of the foregoing reasons, the Court finds that Oliver has failed to satisfy his burden of establishing that the FCA's public disclosure bar does not apply to his claims. Accordingly, the Court shall GRANT Defendant's motion for lack of subject matter jurisdiction on the grounds that Oliver's claims are based upon publicly disclosed information, of which Oliver is not the original source.


Date:   June 13, 2013


\_\_\_\_\_/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge