**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES *ex rel.* ANTHONY OLIVER <br><br> Plaintiff, <br><br> v. <br><br> PHILIP MORRIS USA, INC., <br><br> Defendant. |

**Civil Action No. 08-0034 (CKK)**

**MEMORANDUM OPINION**
(April 30, 2015)

The plaintiff/relator in this case, Anthony Oliver ("Oliver"), brings suit against Philip

Morris USA Inc. ("Defendant") pursuant to the False Claims Act (the "FCA"), 31 U.S.C. §§

3729 *et seq.*  Presently before the Court is Defendant's Second Motion to Dismiss Pursuant to

Fed. R. Civ. P. 12(b)(1).  ECF No. [69].  Upon consideration of the parties' submissions, the

applicable authorities, and the record as a whole, the Court shall GRANT Defendant's motion

and dismiss this case for lack of subject matter jurisdiction.[1]

## I.  BACKGROUND

This Court and the D.C. Circuit have previously set forth the details of this case.  *See*

---

[1] While the Court renders its decision on the record as a whole, its consideration has focused on the following documents: Pl.'s Second Am. Compl. ("Compl."), ECF No. [49]; Def.'s Mem. in Supp. of Def. Philip Morris USA Inc.'s Second Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) ("Def.'s Mem."), ECF No. [69-1]; Relator's Mem. in Opp'n to Philip Morris USA Inc.'s Second Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) ("Pl.'s Opp'n"), ECF No. [75]; Def.'s Reply in Supp. of Def. Philip Morris USA Inc.'s Second Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) ("Def.'s Reply"), ECF No. [76].  In an exercise of its discretion, the Court finds that holding oral argument on the instant motion would not be of assistance in rendering a decision.  *See* LCvR 7(f).

*United States ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36, 38-39 (D.C. Cir. 2014);

*United States ex rel. Oliver v. Philip Morris USA Inc.*, 949 F. Supp. 2d 238, 240-42 (D.D.C.

2013).  An abbreviated summary of the facts follows.

Oliver, the President and CEO of Medallion Brands International Co., a tobacco

company, filed this *qui tam* suit on January 4, 2008.  ECF No. [1].  The United States declined to

intervene.  ECF No. [28].  In his Second Amendment Complaint, ECF No. [49] (hereinafter the

"Complaint"), which is the operative complaint in this action, Oliver alleges that Defendant

violated the FCA by falsely certifying that it was providing the United States military with the

best price for its cigarettes.

Specifically, Oliver alleges that, at least from 2002 until the date the Complaint was filed,

Defendant supplied the Navy Exchange Service Command ("NEXCOM") and the Army and Air

Force Exchange Service ("AAFES") with cigarettes.  Compl. ¶ 20.  Oliver claims that Defendant

sold cigarettes to NEXCOM and AAFES "pursuant to purchase orders . . . that have

incorporated, expressly or impliedly" most favored customer ("MFC") warranties.[2]  *Id.* ¶¶ 21,

30, 34.  Oliver alleges that Defendant violated these warranties by "knowingly [selling] cigarette

---

[2] Oliver alleges that NEXCOM's contracting requirements included the following: "The Contractor certifies that prices, terms and conditions offered under this contract, including consideration of any discount rebate arrangements, do not exceed prices then being charged the Contractor's most favored customer or another military exchange for like items."  Compl. ¶ 14. And he alleges that, from November 1995 until December 2007, AAFES's contracting requirements included the following: "The Contractor warrants that during this contract, the net price to AAFES (considering each unit price, discounts, allowances, co-op advertising, rebates, and other terms and conditions) for each item purchased will be as favorable as, or better than, the price the item is being sold by the Contractor to other customers under the same or similar conditions and in the same general geographical area pursuant to agreements made during the same period."  *Id.* ¶ 16.  In December 2007, the AAFES MFC was modified as follows: "The prices for products provided by the Contractor in this contract are hereby warranted by the Contractor to be comparable to, or more favorable to AAFES than, the comparable prices, terms, and conditions that have been offered by the Contractor to any of its customers."  *Id.* ¶ 19.

products identical to the cigarettes sold to AAFES and NEXCOM to affiliates of defendant . . . at prices lower than the prices such cigarettes were sold to NEXCOM and AAFES." *Id.* ¶ 25. Accordingly, Oliver contends that Defendant's "purchase orders and other forms of contract for sales of its cigarette products to [AAFES and NEXCOM] . . . falsely warranted that defendant [was] in compliance with [the MFC warranties]." *Id.* ¶¶ 31, 35. As a consequence of this fraud, Oliver alleges that Defendant "charged NEXCOM and AAFES millions of dollars more, annually, for its cigarette products than has been paid by either defendant's affiliates purchasing such products or foreign purchasers buying such products from defendant's affiliates." *Id.* ¶ 29.

In its original motion to dismiss, Defendant argued, first, that the public disclosure bar deprived this Court of subject matter jurisdiction over Oliver's suit and, second, that the Complaint failed to state a claim upon which relief could be granted. *See* Def.'s Mem. of Law in Supp. of Def. Philip Morris USA Inc.'s Mot. to Dismiss ("Def.'s First MTD"), ECF No. [53-1]. This Court granted Defendant's motion to dismiss for lack of subject matter jurisdiction. First, this Court held that the price differentials alleged by Oliver had previously been publicly disclosed in a document– which came to be called the "Iceland Memo"[3] – that was uploaded to a publicly available, fully searchable online database as part of a 1998 settlement agreement. *See Oliver*, 949 F. Supp. 2d at 244-47. Second, this Court held that while "the [Iceland Memo] does

---

[3] The D.C. Circuit described the contents of the document as follows: "The Iceland Memo is a Philip Morris inter-office transmittal sheet dated December 28, 1999, relating to a letter . . . that the director of Morale, Welfare & Recreation . . . at a United States naval station in Iceland apparently wrote to a duty-free wholesaler of Philip Morris cigarettes as part of MWR's unsuccessful efforts to buy cheaper Philip Morris cigarettes from the duty-free source." *Oliver*, 763 F.3d at 40. The Iceland Memo contained the following line: "[Philip Morris International] Duty-Free list prices are lower than [Philip Morris] USA Military tax-free prices and we frequently receive inquiries from the Service Headquarters on why they can't purchase tax-free product at these lower prices." *See* Def.'s First MTD, Ex. A (Mem. from Mike Madden to Jacquie Gilbert regarding MWR NAS Keflavik, Iceland, Dec. 28, 1999).

not reference the reason why the pricing differential is of questionable legality (*i.e.*, the 'most favored customer' certifications), the Court agrees with Defendant that the 'most favored customer' provisions contained within the AAFES and/or NEXCOM's General Provisions Publications are legal requirements that the Government is presumed to know." *Id.* at 248-49. This Court further held that "Defendant's certifications with the 'most favored customer' requirements – by way of the purchase orders and contracts pertaining to its sales – can be inferred by the simple fact that AAFEX and NEXCOM continued to purchase Defendant's cigarette products during the time covered by the Complaint." *Id.* at 249.  As such, the Court concluded that "Oliver's Complaint describes 'transactions' 'substantially similar to those in the public domain' and therefore is 'based upon' the public disclosure of those transactions." *Id.* Moreover, the Court held that Oliver could not salvage subject matter jurisdiction for his suit by showing that he was an "original source" as defined in 31 U.S.C. § 3730(e)(4)(B).  In particular, the Court found that Oliver "failed to show that he ha[d] 'direct' knowledge . . . of the allegations underlying his Complaint." *Id.* at 250.  He also failed to prove that he disclosed "the fraud relating to the 'most favored customer' clauses that are the subject of his Complaint" to the government. *Id.* at 250-51.  This Court therefore granted Defendant's motion to dismiss for lack of subject matter jurisdiction. *Id.* at 251.

Plaintiff appealed this Court's judgment.  The D.C. Circuit explained that it only lacked subject matter jurisdiction over Oliver's claims if "*both* the pricing disparities and [Defendant's] false certifications of compliance with the Most Favored Customer provisions . . . were in the public domain." *Oliver*, 763 F.3d at 41.  The Circuit "assum[ed] *arguendo* that the certifications could be inferred from the disclosure of the Most Favored Customer provisions," but nevertheless found that "Oliver's suit is not barred because the Most Favored Customer

provisions were not publicly disclosed." *Id.* Rejecting Defendant's arguments to the contrary, the Circuit held that "the government's awareness of the Most Favored Customer requirements does not amount to their public disclosure" and that "the Iceland Memo did not publicly disclose the requirements of the Most Favored Customer provisions." *Id.* at 42-43. After oral argument, Defendant submitted to the Circuit "a letter proffering new evidence purporting to show that the Most Favored Customer provisions were publicly available on the Exchanges' websites before 2008." *Id.* at 44. The Circuit declined to consider this evidence. *Id.* ("[Defendant] has provided no explanation for its failure to timely present its new evidence to the district court, nor for its delay in providing that evidence to us. We are, in any event, in no position to assess on appeal its authenticity or its bearing on the issue for which it was submitted."). The Circuit therefore vacated this Court's dismissal of the Complaint. *Id.*

Defendant has now submitted a second motion to dismiss for lack of subject matter jurisdiction. Accompanying the motion, Defendant has submitted new evidence purporting to show that the MFC requirements were publicly available throughout the period when Oliver alleges that the fraud occurred. Defendant now explains that, "[i]n May 2014, [Defendant] . . . ran extensive public and federal records searches for evidence of pre-2008 Internet publication of the AAFES and NEXCOM MFC provisions." Def.'s Mem., Decl. of Eric T. Werlinger ("Werlinger Decl.") ¶ 4. Defendant states that it discovered documents suggesting that "the Uniform Resource Locators ('URLs') for the AAFES and NEXCOM webpages [Defendant] cited in its July 2012 motion to dismiss were different than the URLs associated with the exchanges' websites before January 2008." *Id.* ¶ 5. Armed with these pre-2008 URLs, Defendant "searched the Internet Archive, a website that 'offer[s] permanent access for researchers, historians, scholars, people with disabilities, and the general public to historical

collections that exist in digital format.'" *Id.* ¶ 6 (quoting *Internet Archive*, https://archive.org/about). On the Internet Archive, Defendant found "archived pages [from] 2002 and 2003 . . . linking to copies of both the AAFES Supplier Requirements and Terms and Conditions and the NEXCOM General Provisions Publication No. 61 that contain the MFC provisions at the heart of this case."[4] *Id.* ¶ 7.

Oliver has also submitted new evidence that he asks this Court to consider. This new evidence consists of a declaration in which Oliver explains how he learned of the fraud and what he told the government. *See* Pl.'s Opp'n, Decl. of Anthony Oliver ("Oliver Decl."). In the declaration, Oliver explains that he learned a critical piece of information from Tim Maloney, a "tobacco category buyer for NEXCOM," in 2007 when Oliver and Maloney were discussing the possibility of Oliver's tobacco business "expanding its sales to NEXCOM's overseas outlets." *Id.* ¶ 3. Oliver told Maloney that he would deduct several surcharges that Oliver believed only applied domestically. *See id.* ¶ 5. Oliver reports that "Maloney was surprised when [Oliver] told him that . . . the two surcharges [did not apply] to overseas sales" and that "[Maloney] told [Oliver] that NEXCOM's other cigarette suppliers, including [Defendant], did not adjust their

---

[4] The archived NEXCOM webpage is located at https://web.archive.org/web/20020804185351/ http://www.navy-nex.com/command/contractor_vendor/PUBS/general_provisions/section_c.html ("Archived NEXCOM Page"). The archive of AAFES's Terms and Conditions is located at https://web.archive.org/web/20030714061220/http://www.aafes.com/pa/selling/termscon.pdf ("Archived AAFES Page"). Defendant has also provided the Court with a link to an archive of AAFES's webpage for suppliers, which contains a link to the aforementioned Terms and Conditions page: https://web.archive.org/web/20030921021246/ http://www.aafes.com/pa/selling. Defendant included a reproduction of these webpages as an exhibit. *See* Def.'s Mem., Ex. A.

    An Office Manager at the Internet Archive explains, via affidavit, that the website "assigns a URL on its site to the archived files in the format http://web.archive.org/web/[Year in yyyy][Month in mm][Day in dd][Time code in hh:mm:ss]/[Archived URL]." *See* Def.'s Mem., Aff. of Christopher Butler ¶ 5. According to this coding scheme, the AAFES Terms and Conditions document was archived on July 14, 2003, the general AAFES website was archived on September 21, 2003, and the NEXCOM website was archived on August 4, 2002.

overseas prices to NEXCOM (as compared to the domestic prices they charged NEXCOM for their cigarette products) to reflect the inapplicability of these surcharges to overseas sales." *Id.*; *see also id.* ¶ 6 ("Mr. Maloney indicated to [Oliver] that the pricing to NEXCOM included amounts to cover the surcharges . . . ."). After this revelation from Maloney, Oliver reportedly "made inquiries with certain of [his] industry contacts, including duty-free operators and overseas distributors, as to whether [Defendant's] wholesale prices to them – civilian overseas purchasers buying cigarettes identical to the cigarettes sold to the military exchanges in comparable markets to the military exchanges – included the . . . surcharges." *Id.* ¶ 7. These sources "confirmed to [Oliver] that amounts to cover the . . . surcharges for [Defendant's] overseas cigarette products were definitely not included in the pricing of civilian overseas cigarette sales." *Id.* Oliver provides one example, explaining that he contacted Kenny Hasegawa, a "co-owner of a duty-free business in Samoa," who "provided [Oliver] information about the prices his company was paying for [Defendant's] cigarettes, which were substantially lower than the prices that the military exchanges were paying for similar cigarette products." *Id.* Hasegawa also told Oliver that "the cigarettes he purchased from [Defendant] were identical to the cigarettes being sold to the military exchanges." *Id.*

Based on these inquiries, Oliver "concluded that [Defendant] [was] defrauding NEXCOM and [AAFES] by failing to adjust their prices to reflect the inapplicability of the . . . surcharges." *Id.* ¶ 9. He therefore "arranged to meet with officials of both AAFES and NEXCOM to report the ongoing fraud." *Id.* ¶ 10. At the meeting with a NEXCOM official, Oliver "described how [Defendant] [was] overcharging NEXCOM and AAFES by fraudulently including the . . . surcharges in their military exchange pricing even though those surcharges were inapplicable and were not being included in the prices [Defendant] [was] charging overseas

civilian customers for the same products." *Id.* Oliver reports that he provided an AAFES official with the same information. *Id.* Oliver also claims to have "contacted the Department of Defense hotline for reporting government contractor fraud" by both e-mail and by phone. *Id.* ¶ 11. On the phone call, Oliver asserts that he "described the overcharging price fraud" to the Deputy Director of the hotline. *Id.* Oliver claims to have taken all these actions before filing the present action. *Id.* ¶ 12. Finally, Oliver explains that he continued his investigation after he filed this action, during which time he purportedly discovered that the overcharging was not limited to the failure to deduct the domestic surcharges. *See id.* ¶ 13; *see also* Compl. ¶ 26.

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction over its claim. *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007). In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted). "At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (citations omitted).

## III.   DISCUSSION

### A.  Effect of the D.C. Circuit Decision

Oliver's first argument is that this Court is "bound to follow the D.C. Circuit's decision on remand," which "forecloses the arguments [Defendant] makes in its second motion to dismiss." Pl.'s Opp'n at 12, 20.  In particular, Oliver argues that the D.C. Circuit held that Defendant "had 'abandoned' its argument that the MFCs were accessible pre-2008." *Id.* at 19. He points out that "the D.C. Circuit explicitly refused to consider [Defendant's] new evidence." *Id.* at 20.  Finally, Oliver contends that "the 'law of the case' doctrine precludes" this Court from exercising its discretion to consider Defendant's new evidence. *Id.* at 20-21 n.7.

As an initial matter, while Oliver is correct that this Court is obligated to follow the law as set forth by the D.C. Circuit, the Circuit has not resolved the issue presently before this Court. After oral argument, Defendant submitted to the Circuit the evidence it now presents to this Court. *See* Def.'s Mem., Tab 2 (Philip Morris USA Inc.'s Federal Rule of Appellate Procedure 28(j) Letter, No. 13-7105 (D.C. Cir. May 12, 2014)).  The D.C. Circuit pointed out, however, that it "typically do[es] not consider new evidence on appeal," and it saw "no reason . . . to depart from [its] regular practice." *Oliver*, 763 F.3d at 44.  Noting that it was "in no position to assess on appeal [the evidence's] authenticity or its bearing on the issue for which it was submitted," the Circuit "d[id] not consider [Defendant's] new evidence." *Id.*  Additionally, in disposing of the case, the Circuit did not reverse this Court's order dismissing for lack of subject matter jurisdiction, but rather vacated the order and "remanded for further proceedings consistent" with its opinion. *Id.*  "[V]acatur 'clears the path for future relitigation of the issues between the parties . . . .'" *United States Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 22 (1994) (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950)); *see also E-*

*Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1218 (Fed. Cir. 2007) (explaining that vacatur

"signal[s] that . . . the district court's prior decision rested upon erroneous grounds" but leaves

open the possibility that the district court may enter "judgment . . . in favor of either party,

depending on the evidence and argument submitted . . . on remand and considered by the district

court in the first instance").  As such, the D.C. Circuit's decision did not resolve Defendant's

present motion.[5]

Oliver next contends that Defendant abandoned its argument that the MFCs were publicly

disclosed.  To be sure, in refusing to consider the new evidence submitted by Defendant after the

oral argument, the D.C. Circuit made the following comment: "[W]e reject Philip Morris's

belated efforts to resurrect arguments it abandoned on appeal."  763 F.3d at 43.  However, for a

number of reasons, this Court does not believe that the Circuit intended this remark to foreclose

Defendant from presenting the new evidence on remand.  First, the Circuit did not find that it

was *barred* from considering the new evidence due to abandonment; rather, it simply suggested

---

[5] In a similar vein, Oliver is incorrect that the law-of-the-case doctrine dictates the resolution of Defendant's motion.  That doctrine states that "the *same* issue presented a second time in the *same* case in the same court should lead to the same *result* that."  *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).  A related concept, the mandate rule, "requires a lower court to honor the decisions of a superior court in the same judicial system."  *Id.* 1393 n.3.  But, as explained above, the D.C. Circuit did not definitively resolve the issue of subject matter jurisdiction; it simply found fault in one aspect of this Court's previous ruling and vacated for further consideration.  Moreover, even if the Circuit had resolved the jurisdictional question, it is widely acknowledged that "where new evidence is available, revisiting the law of the case is proper."  *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 262 (D.D.C. 2004); *accord Bishop v. Smith*, 760 F.3d 1070, 1086 (10th Cir. 2014) (noting that the law-of-the-case doctrine does not apply "when new evidence emerges"); *United States v. Carta*, 690 F.3d 1, 5 (1st Cir. 2012) (explaining that "significant new evidence not previously obtainable" can overcome the mandate rule); *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002) ("[A]ppellate courts may depart from the law of the case and reconsider the issue for . . . reasons such as . . . the availability of new evidence . . . ." (internal quotation marks omitted)).  For these reasons, this Court is not bound by the law of the case to resolve this motion in Oliver's favor.

that appellate courts are ill equipped for considering such evidence.  *See id.* at 44 (noting that, as

an appellate court, the Circuit "ordinarily has no factfinding function" and that "[t]he proper

procedure for dealing with newly discovered evidence is for the party to move for relief from the

judgment in the district court under rule 60(b) of the Federal Rules of Civil Procedure" (quoting

*Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*,

711 F.2d 1071, 1075 (D.C. Cir. 1983))).[6]  Second, "[s]ubject-matter jurisdiction can never be

waived or forfeited."  *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012).  This Court has an

"independent obligation to determine whether subject-matter jurisdiction exists, even in the

absence of a challenge from any party."  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

Oliver cites no precedent for his implicit contention that a court should refuse to consider a piece

of evidence dispositive of subject matter jurisdiction simply because that evidence did not come

to light at the earliest possible stage of the litigation.[7]  Indeed, although it chose not to do so in

the present case, the D.C. Circuit has previously considered evidence relevant to subject matter

jurisdiction presented for the first time on appeal.  *E.g.*, *United States ex rel. Davis v. District of

Columbia*, 679 F.3d 832, 837 (D.C. Cir. 2012) (considering the "letters [Relator] sent to the

government and an affidavit asserting their authenticity" submitted after oral argument that were

---

[6] This Court takes the Circuit's reference to Federal Rule of Civil Procedure 60(b) as merely illustrative of the general principle that Defendant should submit any new evidence to the district court first.  A Rule 60(b) motion by Defendant would not have been appropriate after this Court's previous disposition of the case since judgment was entered in favor of Defendant, and it would not be appropriate at this juncture since the Circuit's vacatur did not result in a "final judgment, order, or proceeding" for Oliver.  Fed. R. Civ. P. 60(b); *see also id.* Notes of Advisory Committee on 1946 Amendments ("[I]nterlocutory judgments are not brought within the restrictions of [Rule 60(b)], but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires.").

[7] To the contrary, Oliver requests that this Court consider new evidence related to his status as an original source.  *See* Pl.'s Opp'n at 29 n.15 ("Mr. Oliver believes that there is no procedural bar to his submitting supplemental evidence on the original source issue . . . .").

relevant to subject matter jurisdiction).  Finally, Defendant's failure to submit the new evidence

to the D.C. Circuit in its initial appellate briefs does not constitute a waiver.  In *Crocker v.*

*Piedmont Aviation*, the D.C. Circuit explained that "full application of the waiver rule to an

appellee puts it in a dilemma between procedural disadvantage and improper use of the cross-

appeal."  49 F.3d 735, 741 (D.C. Cir. 1995).  The D.C. Circuit found that "a degree of leniency"

was in order and considered an argument that had been omitted by a party in an earlier appeal

where the party had been the appellee.  *See id.*  A similar logic applies in the present case, as

Defendant was the appellee before the D.C. Circuit.  For these reasons, the Court finds that it is

not precluded from considering Defendant's new evidence.

**B.  Public Disclosure Bar**

The version of the FCA in effect when Oliver filed his Complaint provided that "[n]o

court shall have jurisdiction over an action . . . based upon the public disclosure of allegations or

transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or

Government Accounting Office report, hearing, audit or investigation, or from the news media,

unless . . . the person bringing the action is an original source of the information."  31 U.S.C. §

3730(e)(4)(A) (2008).[8]  The D.C. Circuit has explained that the phrase "based upon" means

"supported by," not "derived from."  *United States ex rel. Findley v. FPC-Boron Employees'*

*Club*, 105 F.3d 675, 682 (D.C. Cir. 1997).  Thus, the "jurisdictional bar . . . encompass[es]

situations in which the relator's complaint repeats what the public already knows, even though

she had learned about the fraud independent of the public disclosures."  *Id.* at 683.  Defendant

---

[8] For the remainder of this Opinion, unless otherwise specified, all FCA citations will be to the
2008 version of the statute that was in effect when Oliver first filed this suit.  That statute has
since been amended, but the Supreme Court has held that those amendments do not apply
retroactively.  *See Oliver*, 949 F. Supp. 2d at 243 n.5.

argues that the archived webpages show that NEXCOM and AAFES's MFC requirements were already publicly disclosed when Oliver filed his Complaint.

### i.    Authenticity

The Court must initially determine whether there is sufficient evidence to support a finding that the archived webpages are authentic.  The first piece of evidence is an archived online document titled "Terms & Conditions (for Expense, Supplies and Equipment Purchased by AAFES)."  Archived AAFES Page.  This document bears the AAFES logo and is dated January 2001.  *Id.*  The archived page is accessible at a URL with a date stamp that corresponds to an archive date of July 14, 2003.  *See supra* note 4.  The document contains the following language:

> Contractor warrants that during this contract, the net price to AAFES (considering unit price, discounts, allowances, co-op advertising, rebates and other terms and conditions) for each item purchased will be as favorable as, or better than, the price the item is being sold by contractor, to other customers under the same or similar conditions and in the same general geographical area pursuant to agreements made during the same period.

Archived AAFES Page at 7.  This language is identical to the language Oliver alleges AAFES included as a contracting requirement.  *See* Compl. ¶ 16.

The second piece of evidence is a webpage titled "NEXCOM General Provisions Publication Number 61."  Archived NEXCOM Page.  It is accessible at a URL with a date stamp that corresponds to an archive date of August 4, 2002.  *See supra* note 4.  The document contains the following language:

> Most Favored Customer The Contractor certifies that prices, terms and conditions offered under this contract, including consideration of any discount rebate arrangements, do not exceed prices then being charged the Contractor's most favored customer or another military exchange for like items

Archived NEXCOM Page.  Again, this language is identical to the language that Oliver alleges

NEXCOM included as a contracting requirement.  *See* Compl. ¶ 14.

"To satisfy the requirement of authenticating or identifying an item of evidence, the

proponent must produce evidence sufficient to support a finding that the item is what the

proponent claims it is."  Fed. R. Evid. 901(a).  The "appearance, contents, substance, internal

patterns, [and] other distinctive characteristics . . . taken together with all the circumstances," are

sufficient to authenticate the webpages.  *Id.* 901(b)(4).  The webpages include the trademarks of

both AAFES and NEXCOM.  *See* NEX, Registration No. 2146965; NEX, Registration No.

2146966; ARMY AND AIR FORCE EXCHANGE SERVICE, Registration No. 1148343;

AAFES, Registration No. 2167655.  Although both the AAFES and NEXCOM domain names

have changed since the pages were archived, *see* Werlinger Decl. ¶ 5, the domain names from

the archived pages – aafes.com and navy-nex.com – include those organizations' registered

marks.  Finally, as discussed above, the pages contain verbatim recitals of the MFC provisions

that Oliver pleads in his Complaint.  These distinctive characteristics suffice to authenticate the

archived pages under Rule 901.

Oliver does not suggest that the web pages were not published by NEXCOM and

AAFES.  Rather, his only argument contesting authentication is that "it remains unclear when

[the webpages] became available on the Internet."  Pl.'s Opp'n at 22 n.9.  He points to the

Frequently Asked Questions page of the Internet Archive, which states that "[t]he date assigned

by the Internet Archive applies to the HTML file but not to image files linked therein."

*Frequently Asked Questions*, https://archive.org/legal/faq.php.  He does not, however, argue that

the pages submitted by Defendant link to any images.  The Court has carefully examined the

webpages and is confident that the pertinent language is on the webpages themselves and is not

embedded in any image file.  Oliver highlights another line from the FAQ explaining that "if a user . . . clicks on a link on an archived page . . . and the link is not available, sometimes the Wayback Machine will redirect to the live web."  *Id.*  Again, though, this observation is irrelevant because Defendant has submitted to the Court the actual archived webpages.  That relevant language on those webpages is visible without clicking on any links.  The Court is confident that it is examining the archived websites and not the live web.  *See also* Def.'s Mem., Aff. of Christopher Butler ¶ 6 (verifying that the submitted documents are "records of the HTML files for the URLs and the dates specified in the footer of the printout"); Def.'s Mem., Aff. of John T. Hollyoak ¶ 7 (attesting that "the archived webpages" submitted to the Court "each . . . contain a URL indicating the pages and links were crawled by Internet Archive software" in 2002 and 2003).

In light of the above, the Court concludes Defendant has submitted sufficient evidence to support a finding that the archived webpages are authentic.  *See also United States v. Kieffer*, 681 F.3d 1143, 1153 n.3 (10th Cir. 2012) (affirming authenticity of Internet Archive evidence); *United States v. Bansal*, 663 F.3d 634, 667-68 (3d Cir. 2011) (same).

ii.   **"Public Disclosure"**

To implicate the jurisdictional bar, the webpages must have been "public disclosure[s] . . . in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or investigation, or from the news media."  31 U.S.C. § 3730(e)(4)(A).  Defendant argues that the "the MFC provisions were publicly disclosed for FCA purposes either as administrative reports or as disclosures through the news media."  Def.'s Mem. at 14 (citations omitted).  Oliver responds, first, that a disclosure can only constitute an administrative report if "there is some kind of focused inquiry or analysis by which the

government compiles the information that is being disclosed" and argues that Defendant

"presents no evidence of any such inquiry or analysis." Pl.'s Opp'n at 23. Oliver contends that

categorizing NEXCOM and AAFES's webpages as administrative reports "would effectively

mean that any document on any government website anywhere . . . would be an 'administrative

report.'" *Id.* at 23-24. Oliver also argues that the webpages cannot constitute disclosures by the

news media because the term "news media" means "a person or entity that gathers information

of potential interest to a segment of the public, uses its editorial skills to turn the raw material

into a distinct work, and distribute that work to an audience." *Id.* at 24 (quoting *Nat'l Sec.*

*Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989)). Oliver contends that

NEXCOM and AAFES do not meet this definition. *Id.* at 25.

The seminal case on the meaning of the term "report" for FCA purposes is *Schindler*

*Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885 (2011). The *Schindler* Court

considered whether "a federal agency's written response to a request for records under the

Freedom of Information Act . . . constitutes a 'report' within the meaning of the public disclosure

bar." *Id.* at 1889. "[L]ook[ing] first to the word's ordinary meaning," the Supreme Court

defined "report" as "'something that gives information' or a 'notification' . . . or '[a]n official or

formal statement of facts or proceedings.'" *Id.* at 1891 (quoting Webster's Third New

International Dictionary 1925 (1986) and Black's Law Dictionary 1300 (6th ed. 1990)). The

Court noted that "[t]his broad ordinary meaning of 'report' is consistent with the generally broad

scope of the FCA's public disclosure bar." *Id.* The Court specifically rejected the narrower

reading of the Second Circuit, which, relying on the surrounding statutory context, interpreted

the word report to "connote the synthesis of information in an investigatory context." *Id.* at 1892

(quoting *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 107 (2d Cir. 2010)).

The Court concluded that a "written agency response to a FOIA request falls within the ordinary meaning of 'report.'"  *Id.* at 1893.

The webpages at issue in this case are "administrative . . . report[s]."  31 U.S.C. § 3730(e)(4)(A).  First, there is no dispute that the webpages are "administrative": both AAFES and NEXCOM are agencies within the U.S. Department of Defense.  *See* Compl. ¶¶ 5-7.  Second, in light of the broad interpretation expounded in *Kirk*, the webpages constitute reports.  The webpages clearly "give[] information."  131 S. Ct. at 1891.  Specifically, they inform the public, including potential government contractors, of the terms and conditions on which AAFES and NEXCOM do business.  Oliver's argument – that a document is only a report if it is the culmination of a "focused inquiry or analysis," *see* Pl.'s Opp'n at 23 – is little more than a restatement of the Second Circuit's requirement that the document be a "synthesis of information in an investigatory context."  601 F.3d at 107.  The Supreme Court squarely rejected this narrow interpretation, and Oliver offers no new support for his reading of the statute.  By providing information, the webpages at issue fall within the plain meaning of the word "report."  *See also United States ex rel. Conrad v. Abbott Labs., Inc.*, Civil Action No. 02-11738, 2013 U.S. Dist. LEXIS 26048, at *18-21 (D. Mass. Feb. 25, 2013) (holding that files with "thousands of lines of unadorned data" published online by a government agency were administrative reports); *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 518 (N.D. Tex. 2012) (holding that descriptions of new medical devices published by the FDA were administrative reports even though they were authored by the device manufacturers); *United States ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*, 739 F. Supp. 2d 396, 407 (S.D.N.Y. 2010) (holding that a searchable database of property tax information constituted an administrative report).

For the sake of completeness, this Court will consider, in the alternative, whether the webpages would also qualify as information disclosed "from the news media." 31 U.S.C. § 3730(e)(4)(A). In this Court's previous Opinion, it reasoned that "[a]lthough *Schindler* concerned the meaning of government reports, the 'generally broad,' 'wide-reaching' scope of the FCA's public disclosure bar undoubtedly requires a similarly generous application of the other categories enumerated in the statute." 949 F. Supp. 2d at 246 (quoting *Schindler*, 131 S. Ct. at 1891); *see also Schindler*, 131 S. Ct. at 1892 (finding that the inclusion of the phrase "news media" "suggests a much broader scope" for the FCA jurisdictional bar). This Court also noted that "courts . . . have construed the term to include readily accessible websites." 949 F. Supp. 2d at 246-47 (quoting *United States ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*, 843 F. Supp. 2d 20, 32 (D.D.C. 2012)). As such, this Court held that the Iceland Memo, which was posted "online in a public, searchable database pursuant to a settlement agreement and subsequent court order," constituted a public disclosure from the news media. *Id.* at 247. This Court also held that the "re-posting of the document in a text-searchable university database available to the general public likewise constitute[d] public disclosure in the 'news media.'" *Id.* The Court of Appeals decision did not disturb that portion of this Court's ruling.[9] *See Oliver*, 763 F.3d at 41 ("We need not resolve whether the pricing disparities were publicly disclosed in the Iceland Memo . . . ."). Other courts, in this Circuit and elsewhere, have also broadly applied the term "news media" to sources other than traditional media outlets. *See, e.g.*, *Green*, 843 F. Supp. 2d at 32-33 (holding that a promotional webpage published by a labor

---

[9] Oliver requests that this Court revisit its decision that the Iceland Memo was publicly disclosed. Pl.'s Opp'n at 26-28. Oliver does not offer any persuasive arguments on this front, however. Even if the Iceland Memo was not disclosed by the news media, it was included in discovery materials that were made public and searchable, which constitutes a disclosure in a civil hearing. *See Oliver*, 949 F. Supp. 2d at 246.

union's trust fund constituted a public disclosure by the media because it was "readily accessible to the public"); *United States ex rel. Repko v. Guthrie Clinic, P.C.*, No. 3:04cv1556, 2011 U.S. Dist. LEXIS 98584, at *24 (M.D. Pa. Sept. 1, 2011) ("[I]nformation contained on publicly available websites can be public disclosures within the meaning of the FCA."); *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 582 F. Supp. 2d 766, 772 (W.D. Va. 2008) (holding that labeling information posted to a corporation's webpage under the heading "News & What's New" constituted a public disclosure from the news media); *United States ex rel. Brown v. Walt Disney World Co.*, No. 6:06-cv-1943, 2008 U.S. Dist. LEXIS 116832, at *11 & n.7 (M.D. Fla. June 24, 2008) (holding that Wikipedia qualifies as "news media"). *But see United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, Civ. No. 12-1562, 2014 U.S. Dist. LEXIS 133036, at *18 (D. Del. Sept. 23, 2014) (holding that CNN iReports, which were "not edited, fact-checked or screened," and two blog postings were not "news media"); *United States ex rel. Simpson v. Bayer Corp.*, No. 05-3895, 2013 U.S. Dist. LEXIS 124928, at *23-24 (D.N.J. Aug. 30, 2013) ("Unlike an article on a website maintained by a recognized news outlet, a trade journal, or even a promotional website geared toward the dissemination of information, the anonymous postings in this case amounted to nothing more than vague allegations in an informal forum discussion without any indicia of reliability or substantiation.").

The webpages in the present case are more akin to the promotional webpage in *Green* and the labeling information in *Radcliffe* than the anonymous blog posts and forum discussions in *Moore* and *Simpson*, respectively. Even though the NEXCOM and AAFES webpages did not contain a "news" header, the purpose of those pages was clearly to give the public an accurate account of those entities' contracting requirements. And it is undisputed that the websites were available to the public and searchable. In light of the broad reading given to the jurisdictional

bar by the Supreme Court in *Schindler*, and without deciding whether every internet posting constitutes a public disclosure, this Court concludes that the NEXCOM and AAFES webpages were published by the "news media" for purposes of the FCA.

iii.    **"Allegations or Transactions"**

The FCA's jurisdictional bar applies "whenever the relator files a complaint describing allegations or transactions substantially similar to those in the public domain." *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999) (quoting *Findley*, 105 F.3d at 682). The "allegations or transactions" in the public domain need not "irrefutably prove a case of fraud' to trigger the jurisdictional bar; rather, the central inquiry is "whether the publicly disclosed information 'could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing.'" *Id.* at 918-19 (quoting U*nited States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)). The D.C. Circuit has explained that "if X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed." *Springfield Terminal*, 14 F.3d at 654 (emphasis omitted).

The D.C. Circuit restated Oliver's allegations using the *Springfield Terminal* formulation as follows:

> [T]he fact that [Defendant] was not providing the Exchanges with the best price for cigarettes (X) plus the fact that [Defendant] falsely certified that it complied with the Most Favored Customer provisions (Y) gives rise to the conclusion [Defendant] committed fraud (Z). The court lacks jurisdiction over Oliver's suit only if X *and* Y, i.e., *both* the pricing disparities and [Defendant]'s false certifications of compliance with the Most Favored Customer provisions, were in the public domain.

*Oliver*, 763 F.3d at 41.  This Court previously held that "the fact of Defendant's certifications with the 'most favored customer' requirements – by way of the purchase orders and contracts pertaining to its sales – can be inferred by the simple fact that AAFEX and NEXCOM continued to purchase Defendant's cigarette products during the time covered by the Complaint."  949 F. Supp. 2d at 249.  The D.C. Circuit did not rule on the propriety of this inference.  763 F.3d at 41 ("*Even assuming arguendo that the certifications could be inferred from the disclosure of the Most Favored Customer provisions*, Oliver's suit is not barred because the Most Favored Customer provisions were not publicly disclosed." (emphasis added)).

Oliver asks this Court to revisit its previous holding.  He points out that "neither the Iceland Memo nor the MFC provisions mentions either the express or implied price certifications that [Defendant] falsely made to the Exchanges."  Pl.'s Opp'n at 17.  He contends that "[t]hese express or implied certifications are an essential part of the fraudulent transaction."  *Id.*  He argues that "the simple allegation of a price disparity does not . . . imply a breach of . . . the MFCs," and, therefore, "the Iceland Memo, even when combined with the MFCs, does not provide the 'clear or substantial . . . indication of foul play' that is required for the public disclosure bar to apply."  *Id.* at 18-19 (quoting *Springfield Terminal*, 14 F.3d at 656).

The Court remains convinced that the Iceland Memo and the MFC provisions, together, are sufficient to trigger the public disclosure bar.  As Oliver himself alleges in his Complaint, the MFC regulations "are incorporated by reference" in the relevant contracts.  Compl. ¶¶ 11, 17; *see also* Archived AAFES Page ("This document will not be included in each solicitation or contract.  It will be incorporated by reference.").  In light of this contractual language, the Court concludes that a hypothetical government investigator aware of the price discrepancies and the MFC provisions would be "alerted . . . to the likelihood" that the vendor was falsely certifying

compliance with the relevant provisions.[10]  *See Settlemire*, 198 F.3d at 918 (quoting *Springfield Terminal*, 14 F.3d at 654).

Moreover, the facts alleged in Oliver's Complaint and the facts publicly disclosed prior to the filing of that Complaint are "substantially similar."  *Id.* (quoting *Findley*, 105 F.3d at 682).  Nowhere in Oliver's Complaint does he plead with the requisite degree of specificity, *see* Fed. R. Civ. P. 9(b), that Defendant expressly certified compliance with the MFCs, s*ee* Compl. ¶¶ 30, 34 ("Defendant . . . has, for a number of years, . . . sold its cigarette products to [NEXCOM and AAFES] pursuant to purchase orders . . . that have incorporated, expressly or impliedly, the [MFCs] . . . ."); *see also* Opp. at 10 ("Oliver also alleges that [Defendant] submitted purchase orders for sales of its products to the Exchanges and other contract documents that either impliedly or expressly incorporated a false certification that it was in compliance with its MFC obligations.").  That is, Oliver does not allege that "the bills or invoices submitted to [the Government] contained explicit statements that [Defendant] was in compliance with [the MFC provisions]."  *United States v. Speqtrum, Inc.*, 47 F. Supp. 3d 81, 91 (D.D.C. 2014).  Indeed, Oliver concedes that he does not have access to the documents that would contain such express certifications.  Compl. ¶¶ 30, 34 ("Because relator has not yet been afforded discovery in this action, he is not at present in possession of such purchase orders and is unable to provide greater specification of the details of each of these purchase orders at this time.").  Since Oliver's Complaint lacks any details revealing express certifications, the fact that "neither the Iceland Memo nor the MFC provisions mentions either the express or implied price certifications" fails

---

[10] Oliver argues that Defendant concedes – in the 12(b)(6) context – that a pricing disparity alone does not give rise to an inference of an MFC violation.  Pl.'s Opp'n at 18 (quoting Def.'s Reply in Supp. of Philip Morris USA Inc.'s Mot. to Dismiss, ECF No. [60] at 18.)  But these positions are not irreconcilable because, as Defendant points out, the legal standard for pleading fraud is different than the standard for public disclosure.  *See* Def.'s Reply at 13.

to differentiate those disclosures from his Complaint.[11]  Pl.'s Opp'n at 17.  Because Oliver's

Complaint does not allege any material facts regarding Defendant's false certifications that were

not already publicly disclosed, the FCA jurisdictional bar applies.

## C.  Original Source

Oliver contends that, even if his allegations were publicly disclosed, he "was an 'original

source' of the information on which his action is based" and that his Complaint, therefore,

"cannot be dismissed for lack of jurisdiction."  Pl.'s Opp'n at 28 (quoting 31 U.S.C. §

3730(e)(4)(A)).  Observing that this Court previously held that Oliver was not an original source,

*see Oliver*, 949 F. Supp. 2d at 249-51, and that the D.C. Circuit did not disturb this holding,

Oliver has "submitted a second Declaration to address the Court's concerns."  Pl.'s Opp'n at 28-

29.  The content of that Declaration is described fully above: briefly, Oliver learned from a

NEXCOM purchaser, Tim Maloney, that Defendant was including two surcharges in the prices it

charged NEXCOM for cigarettes sold to its overseas outlets that, Oliver argues, only apply

domestically.[12]  *See* Oliver Decl.  ¶ 5.  Oliver learned from "duty-free operators and overseas

distributors," including Kenny Hasegawa, an owner of a duty-free business in Samoa, that

Defendant did not include the surcharges in the "pricing of civilian overseas cigarette sales."  *Id.*

¶ 7.  Oliver alerted NEXCOM and AAFES officials that Defendant was "including the . . .

surcharges in their military exchange prices even though those surcharges were inapplicable and

were not being included in the prices [Defendant was] charging overseas civilian customers for

---

[11] Oliver does not explain, and the Court cannot imagine, how an implied certification could be
publicly disclosed.  Oliver's own allegations on this front are conclusory.  *See* Compl. ¶ 33
("[Defendant's] false statements were material to defendant's false claims for payment and
influenced the decision by NEXCOM to pay such claims.").

[12] Oliver does not specify how he learned that AAFES was also paying these surcharges.  *See*
Oliver Decl. ¶ 9 ("Based on my investigation, I concluded that [Defendant was] defrauding
NEXCOM and [AAFES] . . . .").

the same products." *Id.* ¶ 10.  Finally, Oliver states that he "never saw the Iceland Memo before it was produced by [Defendant] in this lawsuit." *Id.* ¶ 14(a).

An "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action . . . which is based on the information." 31 U.S.C. § 3730(e)(4)(B).  The D.C. Circuit has explained that this provision requires "direct and independent knowledge of *any* essential element of the underlying fraud transaction." *Springfield Terminal*, 14 F.3d at 657.  And the Supreme Court has clarified that the relator must have direct and independent knowledge of the "information upon which the relators' allegations are based," not the "information on which the publicly disclosed allegations that triggered the public-disclosure bar are based." *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 470-72 (2007) (emphasis omitted).  "In order to be 'direct,' the information must be first-hand knowledge." *Findley*, 105 F.3d at 690; *see also Springfield Terminal*, 14 F.3d at 656 ("'Direct' signifies 'marked by absence of an intervening agency.'" (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991))). "In order to be 'independent,' the information known by the relator cannot depend or rely on the public disclosures." *Findley*, 105 F.3d at 690.

Oliver's declaration provides substantial new details about his discovery of Defendant's alleged fraud.  However, these new facts cast doubt on whether Oliver had "'direct' knowledge . . . of the allegations underlying his Complaint." *Oliver*, 949 F. Supp. 2d at 250.  In particular, Oliver gained all of the information critical to his Complaint from other individuals.  He learned of the surcharges Defendant passed on to NEXCOM from his conversation with Tim Maloney, and he was told that Defendant exempted civilian buyers from those surcharges by various

"duty-free operators and overseas distributors," including Kenny Hasegawa.  Oliver Decl. ¶¶ 5, 7.  The D.C. Circuit has stated that, to be "direct," a relator's knowledge must be "first-hand." *Findley*, 105 F.3d at 690.  Other Circuits have elaborated on this standard and found that knowledge is not "direct" when it is derived from conversations with other individuals.  For instance, in *United States ex rel. Newell v. City of St. Paul*, the Eighth Circuit interpreted the law as follows: "'Direct knowledge' is first-hand knowledge; 'a person who obtains secondhand information from an individual who has direct knowledge of the alleged fraud does not himself possess direct knowledge and therefore is not an original source under the [FCA].'"  728 F.3d 791, 797 (8th Cir. 2013) (alteration in original) (quoting *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 703 (8th Cir. 1995)).  The *Newell* court held that a relator was not an original source when he acquired all of the relevant information "from current and former City employees."  *Id.*  And in *United States ex rel. Man Tai Lam v. Man Tai Lam*, the Fifth Circuit stated that "when a relator's claim is based on knowledge received from other persons it is not direct and independent."  287 F. App'x 396, 400-01 (5th Cir. 2008).  The *Man Tai Lam* court denied the relators original source status because all of their knowledge was derived from indirect sources including "patient complaints" and "informal discussions in doctors' lounges." *Id.* at 401.  Many other courts have come to similar conclusions.[13]  This interpretation is

---

[13] *E.g.*, *United States ex rel. Devlin v. California*, 84 F.3d 358, 361 (9th Cir. 1996) ("[T]he relators' knowledge was not direct and independent because they did not discover firsthand the information underlying their allegations of fraud.  They did not see the fraud with their own eyes or obtain their knowledge of it through their own labor unmediated by anything else, but derived it secondhand from Cotey, who had firsthand knowledge of the alleged fraud as a result of his employment at SSD." (footnote omitted)); *United States ex rel. Fine v. Advanced Sciences*, 99 F.3d 1000, 1007 (10th Cir. 1996) ("[T]he relator's knowledge must not be derivative of the information of others, even if those others may qualify as original sources. . . . Fine did not qualify as an original source because his knowledge was secondhand and derivative of the information generated by the auditors who actually performed the audit and uncovered the facts."); *Stinson*, 944 F.2d at 1160-61 ("Stinson's information about Prudential came through

reasonable because it "encourage[s] individuals who are either close observers or involved in the fraudulent activity to come forward" without "creat[ing] windfalls for people with secondhand knowledge of the wrongdoing."  *United States ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003).  Since Oliver has not demonstrated that he had first-hand knowledge of any of the information upon which the allegations in his Complaint is based, the Court concludes that he cannot qualify as an original source.

## IV.  CONCLUSION

For all of the foregoing reasons, the Court finds that Oliver has failed to satisfy his burden of establishing that the FCA's public disclosure bar does not apply to his claims. Accordingly, the Court shall GRANT Defendant's motion to dismiss for lack of subject matter jurisdiction on the grounds that Oliver's claims are based upon publicly disclosed information, of which Oliver is not the original source.

Date: April 30, 2015

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge

---

two intermediaries: the unknown Provident employee responsible for the telephone call and notation and the discovery procedure by which the memoranda were produced. Therefore, Stinson  cannot be deemed to have had 'direct' knowledge of the manner in which Prudential processed its working seniors' claims."); *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 54 (D.D.C. 2007) (refusing to accord a relator "original source" status where all of her knowledge was based on "hearsay statements"); *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 77 (D. Conn. 2006) ("As a matter of law, Relator cannot claim to be an original source of information derived from third parties."); *United States ex rel. Schwedt v. Planning Research Corp.*, 39 F. Supp. 2d 28, 35 (D.D.C. 1999) (holding that the D.C. Circuit's interpretation of the word "direct" in *Findley* "forecloses [relator's] claim that knowledge he obtained from subordinates or outside contractors was 'direct'").